FIFTH DIVISION

JUNE 28, 2002

No. 1-00-2499

IN THE MATTER OF THE APPLICATION ) APPEAL FROM THE

OF THE COUNTY COLLECTOR OF COOK ) CIRCUIT COURT

COUNTY, ILLINOIS, FOR JUDGMENT AND ) OF COOK COUNTY.

ORDER OF SALE AGAINST REAL ESTATE )

RETURNED DELINQUENT FOR THE NON- )

PAYMENT OF GENERAL TAXES FOR THE )

YEAR 1989 AND FOR JUDGMENT FIXING )

THE CORRECT AMOUNT OF ANY TAX )

PAID UNDER PROTEST, )

) HONORABLE

KEN OAK, et al., ) FRANCIS BARTH,

Objectors. ) JUDGE PRESIDING.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, the trial court sustained 5 of 25 objections filed by various property taxpayers (Objectors) challenging the legality of certain 1989 property taxes levied by the City of Chicago (City).  The City appeals the final judgment of the trial court as to those five objections.  The Objectors cross-appeal the pretrial dismissal of one of their objections.  Given the nature of the objections involved in this appeal, this court will set forth the facts disclosed as to each objection while addressing them sequentially.

I.  Background

The tax challenges in this case must be viewed in the context of the City's annual budgeting and appropriations process.  The record discloses that in early December 1988, the City Council approved an appropriations ordinance for the City totaling approximately $2.9 billion.  The 1989 appropriations ordinance describes anticipated revenues and expenditures for 30 separate funds.  The Notes to the City's Combined Financial Statements for 1989, which is part of the City's 1989 Comprehensive Annual Financial Report (CAFR), state that the City's accounts are organized on the basis of funds or account groups; each fund is a separate accounting entity.  

The funds fall into three categories
:  Governmental, Proprietary, and Fiduciary.  According to the 1989 CAFR, the Governmental funds include the General Fund, also known as the Corporate Fund, which  is the City's general operating fund, and accounts for all financial resources except those required to be accounted for in another fund.  The Governmental funds also include Special Revenue Funds, which the 1989 CAFR states are "used to account for revenues from specific taxes or other earmarked revenue sources which by law are designated to finance particular functions of government."  These funds require "separate accounting because of legal or regulatory provisions or administrative action."  The Special Revenue Funds include the Chicago Public Library Funds, the Public Building Commission (PBC) Fund, and the City Relief Fund.

On February 16, 1989, the City Council approved a levy ordinance in the amount of $620,978,709 upon all property subject to taxation in the City.  The levy ordinance incorporated the appropriations ordinance by reference.  The levy ordinance also provided that "[i]n no event shall the amount levied for any purpose ***, exceed the amount appropriated for such purpose, as set forth in the annual appropriations ordinance adopted for the City for the year 1989."

That same day, the City Council also passed a note ordinance (Note Ordinance), authorizing and directing the issuance of "City of Chicago General Obligation Tender Notes, Series 1989."  Series 1989A was issued to finance the cash flow requirements of the City.  Series 1989B was issued to provide $255,750,000 to pay amounts appropriated to specific named funds.

First Deputy Budget Director Carlson identified the 1989 Revenue Estimates Book, as a detailed look at the budget estimates made by the Department of Budget and Management.  The 1989 Revenue Estimates Book states in part that, in conformity with generally accepted accounting principles, the tax levy is distributed to some operating funds through the sale of Daily Tender Notes.  The Corporate Fund, two Library Funds, the Judgment Fund, and the City Relief Fund receive proceeds from such sales.  Daily Tender Notes are sold in anticipation of the collection of taxes in subsequent years, providing the City with operating funds while it awaits the collection of the tax.  Between three and five percent of the levy is not collected; that "loss in collection" is budgeted as an expense in a Note Redemption and Interest Fund 512.

II. Public Aid Funds

The City argues that the trial court erred in sustaining Objection 17, which claimed that the City levied a tax for the City Relief Fund (Fund 660) exceeding the appropriation for that purpose.  Generally, no tax can be levied for any purpose absent a legal appropriation for such purpose, and the levy cannot exceed the amount of the appropriation.  
People ex rel. Schlaeger v. Jarmuth
, 398 Ill. 66, 71, 75 N.E.2d 367, 369 (1947); see 65 ILCS 5/8-3-1 (West 2000).  

The City claims the trial court sustained the objection "on an entirely different basis that the court interjected into the case 
sua sponte
 - - specifically, that the City's original appropriations ordinance for 1989 described the appropriations and levy for public aid purposes in an inadequate manner."  Yet the City also states in its brief that it does "not doubt the circuit court's power to inject this issue into the case ***."  Thus, the City cannot claim reversible error on this point.
(footnote: 1)  It is the judgment and not what else may have been said by the lower court that is on appeal to a court of review; this court may affirm the judgment upon any ground appearing of record.  
Material Service Corp. v. Department of Revenue
, 98 Ill. 2d 382, 387, 457 N.E.2d 9, 12 (1983).

The City Relief Fund is a Special Revenue Fund that provides general assistance to be expended and administered by the Illinois Department of Public Aid as provided by tax levy.  The Illinois Public Aid Code provides in relevant part that:

"To qualify for State funds to supplement local funds for public aid purposes, a local governmental unit shall, except as hereinafter provided, levy within the time that such levy is authorized to be made a tax of an amount which, when added to the unobligated balance available for such purposes at the close of the fiscal year preceding the fiscal year for which the tax is levied will equal .10% of the last known total equalized value of all taxable property in the govern­mental unit."  Ill. Rev. Stat. 1987, ch. 23, § 12-21.13; see 305 ILCS 5/12-21.13 (West 2000).

The Illinois Municipal Code provides in part that:

"Taxes levied by any municipality having a population of 500,000 or more for general assistance for persons in need thereof as provided in The Illinois Public Aid Code, as now or hereafter amended, for each fiscal year shall not exceed the rate of .10% upon the value of all prop­erty therein as that property is equalized or assessed by the Depart­ment of Revenue.  Nor shall the rate produce in excess of the amount needed in that municipality for general assistance for persons in need thereof.

All money received from these taxes and moneys collected or recovered by or in behalf of the municipality under The Illinois Public Aid Code shall be used exclusively for the furnishing of general assistance within the municipality; for the payment of administrative costs thereof; and for the payment of warrants issued against and in anticipation of the general assistance taxes, and accrued interest thereon."  Ill. Rev. Stat. 1987, ch. 24, § 11-43-2; see 65 ILCS 5/11-43-2 (West 2000). 

The 1989 appropriations ordinance incorporated these requirements for Fund 660:

"The aggregate amount to be appropriated hereunder shall equal the maximum authorized tax rate required to qualify this fund for additional money available for expenditures from State funds.  The maximum authorized tax rate is .10 percent of the last known total equalized value of all taxable property within the City."

The City's levy ordinance also provided that the amount levied for any purpose shall not exceed the amount set forth for that purpose in the appropriations ordinance.

The appropriations ordinance showed that Fund 660 had a total of $17,731,203 appropriable for charges and expenditures, of which $1,691,203 represented interest on the sale of daily tender notes;
(footnote: 2) the difference is $16,040,000.

  The deposition testimony of James Welker, who began working for the City in 1965 and held the position of Assistant Comptroller for the City from 1985 through 1998, was admitted into evidence at trial.  Welker testified that a June 19, 1990, letter he sent to the Department of Public Aid gave correct information regarding the 1989 levy.  Welker's June 19, 1990, letter to the Chief of the Bureau of Internal Audits for the Illinois Department of Public Aid states that the correct amount of the levy for 1989 was $18,997,720.  The City's 1987 CAFR states that the total equalized assessed value of all taxable property in 1987 was $18,997,720,225.

According to Welker, proceeds of debt, interest income and tax collections went into the City Relief Fund.  Welker stated that "the levy is in the note fund," and exceeds the principal pertaining to the repayment of the notes issued.  The 1989 appropriations ordinance shows that $257,611,973 was appropriated to Fund 512 for payment of term notes, and $14,230,630 was appropriated for loss in collection of taxes, bringing the fund total to $271,842,603.

On November 29, 1989, the City Council approved a supplemental appropriations ordinance, allocating an unanticipated $400,000 surplus in Fund 660 from the prior year to Fund 660, resulting in a total appropriable for charges and expenditures of $18,131,203.

In sum, the record shows that the City Relief Fund was to be funded by the sale of daily tender notes in an amount which is less than the levy stated by Welker in his June 1990 letter to the State.  The City argues that the amount appropriated cannot be determined only from the entries for the City Relief Fund in the 1989 appropriations ordinance.  Rather, because "the levy is in the note fund," the amount appropriated for city relief 
purposes
 (as opposed to for the City Relief Fund) must be determined by calculating that the $17,301,203 listed in the appropriation for Fund 660 is approximately 6.8829% of the $257,611,973 appropriated to Fund 512 for payment of term notes.  The City then calculates that 6.8829% of the $14,230,630 appropriated for loss in collection of taxes in Fund 512, $979,842, should be added to the base figure.  The City then adds the $400,000 supplemental appropriation to Fund 660, to arrive at a total appropriation of $19,110,685 for city relief purposes.
(footnote: 3)  

The Objectors bear the burden of establishing the invalidity of the levy.  
People ex rel. Redfern v. Penn Central Co.
, 47 Ill. 2d 412, 418, 266 N.E.2d 334, 337 (1971).  However, if there were other compensating estimates by the City which offset the one objected to, so that the Objectors were not harmed, it was the City's duty to prove that fact.  
People ex rel. Schlaeger v. Bunge Bros. Coal Co.
, 392 Ill. 153, 161-62, 64 N.E.2d 365, 369 (1945).

The fact that the City appropriated $17,301,203 to Fund 660 is not proof that it is the correct figure from which to calculate a percentage of the appropriation for Fund 512.  The Note Ordinance directed the issuance of Series 1989B notes for the purpose of the City Relief Fund in the maximum principal amount of $15,869,000, an amount less than the amount appropriated for Fund 660, even after deducting the interest cost.  In this context, the trial court's comment that there was "no way for the City to know that the aliquot or 
pro rata
 portion of the loss and cost of collection has been attributed to the City Relief Fund" speaks not only to whether the City properly disclosed its appropriations and levies, but also to whether the City sustained its burden of proving an offsetting estimate.

The City argues that its failure to itemize Fund 512 in connection with Fund 660 is a mere informality that could be remedied by amendment, because the substantial justice of the levy was not affected.  See 35 ILCS 200/23-40 (West 2000).  The City has not identified where in the record it made this argument in the trial court, resulting in waiver on appeal.  Moreover, without proof that the amount listed for Fund 660 reflects the 
pro rata
 portion of Fund 512 dedicated to city relief, it is impossible to decide whether the substantial justice of the levy was affected.

Thus, the City has failed to show that the trial court erred in sustaining Objection 17.

III.  Estimate Objections

The City next contests the trial court's rulings on two objections to the City's estimates in its appropriations ordinance.  This court shall address each in turn.

A

  The trial court sustained Objection 14, which claimed that the City unlawfully under­estimated revenue for the Library Maintenance and Operation Fund (Fund 346).  Fund 346 had a total of $45,152,451 appropriable for charges and expenditures.  The estimate for 1989 revenue included:  (1) $35,163,451 from the sale of daily tender notes; (2) $1,000,000 in interest; and (3) $260,000 in fine receipts.  Fund 346 also had a surplus of $8,729,000 at January 1, 1989.

The City's CAFRs showed the actual revenue from interest, fines and miscellaneous sources in Fund 346 for calendar years 1983-89 were as follows:

Year
 
Interest
 
Fines
 
Misc.
 
Total

1983     953,586 253,692 119,679 1,326,957

1984  1,527,912 282,854  67,085 1,877,851

1985  2,279,067 225,199 148,993 2,653,259

1986  3,519,240 128,982 332,268 3,980,490

1987  2,780,224 334,118  86,139 3,200,606

1988  1,690,242 356,375 127,629 2,174,246

1989  3,051,444 372,291 103,649 3,527,384

According to Russell Carlson, the First Deputy Budget Director in the City's Office of Budget and Management, his office used the CAFRs as part of the baseline for estimating available resources.  When the 1989 budget was prepared, the 1988 CAFR would not have been available.

Trial exhibits show that "miscellaneous receipts," had been estimated as follows:

Year
 
Misc. Receipts
 
Fines
 
Total Estimate

1983 200,000 275,000 475,000

1984 300,000 200,000 500,000

1985 300,000 200,000 500,000

1986 350,000 233,000 583,000

1987 350,000 234,000 584,000

1988 600,000 260,000 860,000

Former City Budget Director David Schultz testified that interest was included in the estimates for miscellaneous revenues in years 1983-88.  The exhibits show that Fund 346 had a surplus that increased from $50,000 in 1983 to $7,279,426 in 1988.

Daniel Schultz, CPA, the Chief Deputy Auditor for the State of Ohio and a former partner and industry chairman of Coopers & Lybrand's national government and accounting practice, testified as the Objectors' expert witness.  Daniel Schultz did not offer an opinion as to the amount of interest income that should have been estimated for 1989, but opined that "as a rule of thumb," budget estimates of investment revenue should come within a range of 2% to 10% of the actual revenue figure.  Daniel Schultz stated that, from an auditing perspective, an estimate outside that range would be considered a "material" difference, and would require an auditor to either perform additional procedures or to request an adjustment of a particular number.  Daniel Schultz testified that a number of factors would go into an estimate of investment income, including the historical basis for the estimate.  Daniel Schultz opined that if investment income was historically under­estimated by 50%, it would be the result of either "a bad job of estimating" or "an intentional understatement."

Former City Budget Director David Schultz and City Assistant Comptroller Steven Lux opined that the estimates of investment income for Fund 346 had been reasonable under the circumstances, including 3 City financial crises dating back to 1979, deficits occurring as recently as 1986, and reductions in the City's credit rating.  David Schultz also noted that the budget at issue was an election year budget, which would create additional pressure on the Budget Director to hold the line on taxes while providing maximum expenditures.  David Schultz further testified that approximately 75% of the revenues derived from the City's dozens of revenue sources are uncontrollable by the City, as they depend on factors such as future economic conditions.

On appeal, the City argues that the record shows only a discrepancy between the estimated and actual revenue, which is insufficient to sustain an objection.  The Objectors respond that the City's argument mischaracterizes the trial court's ruling as one involving an unnecessary accumu­lation and diversion of funds, instead of an "historical pattern of overstating expenditures or under­stating revenues."  The Objectors rely on several cases, primarily 
In re Application of  Rosewell (Marotta v. Metropolitan Water Dist.)
, 159 Ill. 2d 393, 639 N.E.2d 559 (1994)
.

However, in 
Marotta
, our supreme court 
rejected
 claims that the taxing body underesti­mated its corporate fund surplus, stating that Marotta showed only a discrepancy between the amount estimated and the amount actually available, given that the timing of the budget process was such that exact figures for some parts of the budget were not available when the estimates were made.  
Marotta
, 159 Ill. 2d at 414-5, 639 N.E.2d at 568-69.
(footnote: 4)
 The Objectors note that in 
Bunge Bros. Coal Co.
, our supreme court sustained an objection to the taxing body's alleged overestimate of tax anticipation warrant liabilities.  
Bunge Bros. Coal Co.
, 392 Ill. at 160-62, 64 N.E.2d at 369.  However, the 
Bunge Bros. Coal Co.
 court sustained the objection because the actual figures or balances were known to the comptroller and it was the duty of the city council before passing the appropriation ordinance to ascertain from the comptroller the exact amount of outstanding tax anticipation warrants and the interest thereon.  
Bunge Bros. Coal Co.
, 392 Ill. at 161, 64 N.E.2d at 369.  

In this case, there is no showing that the City knew the amount of miscellaneous revenue or investment income that Fund 346 would receive prior to passage of the 1989 appropriations ordinance.  The Objectors' expert, Daniel Schultz, suggested that the City either did "a bad job of estimating" or made "an intentional understatement," had no opinion as to the correct estimate for interest income for 1989.  Moreover, the record shows that Fund 346 is funded by revenue from not only interest, but also fines and other miscellaneous sources.  The City's witnesses testified that many of the City's revenue flows were volatile.  
The Objectors have not argued that what Fund 346 will receive from fines or miscellaneous revenue sources is easily predicted.

The transcript shows that the trial court sustained Objection 14 based on a pattern of historical underestimation.  However, none of the testimony adduced on Objection 14 showed that the City had certainty in regard to the estimate at issue prior to passage of the 1989 appropriations ordinance.  Thus, Objection 14 cannot be otherwise sustained.  Therefore, the order of the trial court is reversed on this point.

B

The City next argues that the trial court erred in sustaining Objection 20, which claimed that the City overestimated the loss in collections for the Debt Service Funds and the PBC Fund.  Objection 20 claimed that the City illegally added an amount equal to approximately 5.26% of the total levy for various funds to account for losses in collection of the tax; the Objectors claimed that any such amount in excess of 3% was illegal.  The 1989 appropriations ordinance refers to five Debt Service Funds, numbered 509, 510, 512, 568 and 641.  The 1989 property tax levies for the Debt Service Funds do not identify amounts allocated for loss in collection, but the 1989 appropriations ordinance lists such amounts.

The first year loss in collection estimates for the Debt Service Funds in 1989 ranged between 5.1% and 5.5%.  Former Assistant Comptroller Welker testified that for 1989, he was responsible for the levy numbers and the first year loss in collection figures.  Welker testified, to the best of his recollection, that the City had used a 5% first year loss in collection figure for these funds since budget year 1970 through budget year 1998.

Welker testified that, in determining first year loss in collection figures, he would examine the CAFRs "going back a few years."  Welker did not consider interest earned by the Debt Service Funds or other available funds not needed to meet specific upcoming debt obligations. Welker would examine the figures for prior first year collections, but not second or third year collections, explaining that only the first year collections from the current calendar year could be used for debt service in the coming budgetary year.  According to Welker, subsequent year collections would build up in the Debt Service Funds for eventual abatements, but no abatements were made for 1989.

The 1986 and 1987 CAFRs showed the following collection rates:

Percent of Total Tax Collections to Tax Levy

Tax Year
 
'86 CAFR '87 CAFR

1983 97.3% 97.3%

1984 97.1 97.3

1985 96.1 97.4

1986 ----- 94.7

The 1987 CAFR also showed that the collection rate was only 81.7% in Tax Year 1978, but increased to the mid-nineties thereafter, due to the elimination of personal property from assessed values and the State's enactment of a personal property replacement tax.

The 1985 CAFR showed that the Debt Service Funds had a beginning balance of $25,522,000, revenues over expenditures of $5,107,000, an operating transfer out of $13,414,000 and an end of year balance of $17,215,000.  The 1986 CAFR showed that the Debt Service Funds had revenues over expenditures of $11,703,000, an operating transfer out of $6,000,000 and an end of year balance of $22,918,000.  The 1987 CAFR showed that the Debt Service Funds had revenues over expenditures of $25,215,000, and an end of year balance of $48,133,000.  The 1988 CAFR showed that the Debt Service Funds had revenues over expenditures of $29,707,000, and an end of year balance of $77,840,000.  The 1989 CAFR showed that the Debt Service Funds had revenues over expenditures of $27,339,000, an operating transfer out of $30,100,000 and an end of year balance of $80,079,000.

Daniel Schultz, the Objectors' expert, testified that interest income, net taxes receivable and fund surpluses should be considered in calculating the loss in collection figure.  Former City Budget Director David Schultz and municipal bond consultant Kevin McKenna testified that interest income, net taxes receivable and fund surpluses should not be considered in calculating the loss in collection figure.  David Schultz and McKenna testified that interest income and net taxes receivable fluctuated annually and would not be considered a reliable source of security for debt repayment.  David Schultz and McKenna also testified that the City's 5% figure for loss in collection was reasonable under the circumstances.

On appeal, the City states that the Illinois Municipal Code requires municipalities with a population of 500,000 or more to budget for loss of collections.  See 65 ILCS 5/8-2-3 (West 2000).  Our supreme court has ruled that an estimate of loss in collections should consider prior experience, existing economic conditions, and all other factors affecting the estimated loss in collections for the fiscal year.  
People ex rel. Schlaeger v. Jourdan Packing Co.
, 389 Ill. 163, 167, 58 N.E.2d 910, 912 (1945) (and cases cited therein).  Our supreme court also has ruled that there is no fixed rule for determining loss in collections; the percentage to be allowed has rested in the discretion of the taxing authorities.  
People ex rel. Brenza v. Gebbie
, 5 Ill. 2d 565, 589, 126 N.E.2d 657, 669 (1955).

The trial court ruled that the City had failed to exercise sound business judgment by mechanically applying a 5% figure in light of the increase in the overall collection rate and the accumulation of surplus funds, particularly in Bond Redemption and Interest Fund 510.  As the discussion of Objection 14 shows, history is not universally applicable to estimate objections.  The record shows that in estimating first year loss in collection figures, Welker examined the CAFRs "going back a few years."  The CAFRs showed first year collection rates of 94.7% for 1986 and 96.1% for 1985, suggesting that a loss in collection estimate of approximately 5% was not an abuse of discretion.

As litigated, Objection 20 was also based on the City's failure to account for loss in collections beyond the first year, interest to be earned by the funds over the course of a year, and surpluses not needed to defray upcoming debt or lease obligations.  The CAFRs show that the largest second year collection was for 1985, which showed a 1.3% increase from 1986 to 1987.  Our supreme court has held larger discrepancies insufficient to sustain a tax objection.  
Marotta
, 159 Ill. 2d at 414-15, 639 N.E.2d at 568-69 (1.9% difference); 
People ex rel. Brenza v. Morrison Hotel Corp.
, 4 Ill. 2d 542, 546, 123 N.E.2d 488, 491 (1954) (1.5% difference).  

As for the interest earned by the funds during the year and the accumulating surpluses in the funds at issue, the Objectors have cited no authority or made any argument to support their assertion that these amounts are factors affecting the estimated loss in collections for the fiscal year, though such sums ultimately may affect the amount that the City decides to levy in the following year.  See, 
e.g.
, 
People ex rel. Luers v. Chicago & A.R. Co.
, 324 Ill. 179, 185-86, 154 N.E. 893, 895 (1926).  The Objectors state in their brief that the 1989 appropriations ordinance contains no entry for net taxes receivable for its Debt Service Funds or the PBC Fund.  However, the Objectors did not make this claim in Objection 20.
(footnote: 5)  Rather, Objection 20 was directed against the estimated percentage for loss of collections, based on historical experience.  Unlike the overall amount of a levy, the estimated percentage for loss in collections does not appear to be affected by amounts already in the City's coffers or interest gained thereon, based on the record here.

In sum, while the trial court was understandably concerned by testimony that the City had used a 5% estimate for loss of collections for decades, the record shows that for 1989, the City had relied on recent CAFRs and estimated a rate consistent with the rates shown therein.  The increases in second year collections were insufficient to sustain a tax objection under case law.  The Objectors cited no authority for the proposition that funds already collected or accumulating affect estimated losses in collections.  Thus, the trial court erred in sustaining Objection 20.

IV.  Public Building Commission Expense Claims

The City argues that the trial court erred in sustaining objections to the levy for PBC-related expenses.  This court shall address each in turn.

A

  The trial court sustained Objection 19, which claimed that the City improperly had surplus funds from the PBC Fund (Fund 641) applied to purposes other than the payment of rent to the PBC.  Fund 641 is a Special Revenue Fund that makes expenditures for rentals of space and long-term lease obligations by the City as provided by tax levy.  A PBC is a municipal corporation separate from any other municipal corporation or public agency.  See 50 ILCS 20/14 (West 2000).  A PBC exists to construct, acquire, enlarge, improve, repair and replace public improvements, buildings and facilities.  See 50 ILCS 20/4a (West 2000).  A PBC may sell bonds and execute leases to fund its operations.  See 50 ILCS 20/14 (West 2000).  

During the 1970s, in cooperation with the City, the PBC passed bond resolutions for the issuance of six series of bonds to finance various PBC projects:  1971A, 1971B, 1975A, 1975B, 1978A and 1979A.  In connection with each bond series, the PBC entered into a long-term lease with the City for particular facilities, requiring the City to pay rent to the PBC annually; each lease attached a copy of the corresponding bond resolution as an exhibit and stated that the resolution was made a part of the lease.  In connection with each lease, the City Council passed levy ordinances to pay the annual rent, as required by statute; each ordinance attached a copy of the corresponding lease as an exhibit and stated that the lease was made a part of the levy ordinance.

The bond resolutions provide that, so long as the bonds remain outstanding, rent payments would be deposited into a revenue fund.  Sums so deposited would be paid in varying amounts into an administrative expense account, a sinking fund, a renewal replacement and improvement account and a surplus account.  Amounts sufficient to pay the interest and principal on the bonds would be credited to the sinking fund.  

The bond resolutions also provide that after properly crediting the other funds, sums from the revenue fund would be received by the surplus account.  The bond resolutions further provide a hierarchy of priority for making payments out of the surplus account.  Each bond resolution states that within a given period of time before the end of each fiscal year (which is not identical in each resolution, but ranges from 30 to 45 days), remaining surplus funds shall be credited 
pro rata
 to the next annual rental payments due from the City.  The bond resolutions also provide for transfer of sums between the funds, but state that no surplus funds shall be transferred, and the PBC Board shall not authorize such transfers, within the period of time during which the surplus is to be credited 
pro rata
 to the next annual rental payments.

Section 5 of each lease requires the City to provide by ordinance the levy and collection of a direct annual tax sufficient to pay rent under the lease.  Section 5 also states that "funds realized by the City *** from such tax levies shall not be disbursed for any purpose other than the payment of the rent reserved" in the lease.  Section 18 requires the City to pay rent without any deduction, abatement or setoff, subject to section 8.3(6) of the accompanying bond resolution, which is the provision for crediting surpluses against the future rent described above.  Section 21 states that the lease is to inure to the benefit of the parties, their successors and assigns, and "the holders of any of the Bonds of the Commission referred to herein, as their interests may appear."

On November 15, 1988, the PBC passed Resolution No. 3626, which stated that the 6 series of bonds had anticipated surpluses.  Resolution No. 3626 also stated that the PBC had undertaken a project for the City that had not been financed by the issuance of bonds for minor renovations at various facilities totaling $1,951,121.  The resolution then stated that the PBC intended, with the consent of the City, to transfer surplus funds from the Series 1971A, 1971B, 1975A, 1975B, 1978A and 1979A accounts to this project in the varying amounts.  The PBC further stated its intention to transfer $2,813,964 from Series 1978A to pay the City's share of operating, maintenance and repair costs for the Richard J. Daley Center.  

In addition, Resolution No. 3626 stated that $368,640 in surplus would be credited against the 1989 rent due under the lease ultimately financed by Series 1971B. $2,381,385 in surplus funds was to be held in the surplus account for Series 1971A; $2,947,590 in surplus funds was to be held in the surplus account for Series 1978A.  Resolution No. 3626 authorized the transfers of funds "subject to the approval of the City ***."

On February 1, 1989, the City Council passed an ordinance consenting to the fund transfers as described in PBC Resolution No. 3626.

In Objection 19, the Objectors challenged the transfer of sums representing PBC rental credits to fund other projects, including maintenance charges for the Daley Center, in violation of the leases and the PBC bond ordinances.  On appeal, the City argues that the PBC bond resolutions are irrelevant because they are contracts between the PBC and bondholders, to which the City is not a party.  However, sections 1, 5, 18 and 21 of each lease make the respective bond resolutions a part of each lease, restrict the use and transfer of funds, and state that each lease inures to the benefit of the bondholders.  The City's argument is not well-taken.

The City argues that the PBC and the City amended the ordinances and leases or waived their requirements by approving the transfers in a PBC resolution and a City ordinance.  Generally, parties to a contract may amend or rescind their agreement, so long as there is no detriment to a third party who has provided no consideration for the benefit received.  
E.g.
, 
Olson v. Etheridge
, 177 Ill. 2d 396, 410, 686 N.E.2d 563, 569 (1997).  In addition to the interest of the bondholders noted above, courts will not enforce an agreement that induces a breach of official duty.  
E.g.
, 
Bestor v. Wathen
, 60 Ill. 138, 142-43 (1871).  A municipality cannot ignore valid procedures it imposes on itself.  
In re Application of Kane County Collector
, 132 Ill. 2d 64, 69-70, 547 N.E.2d 107, 109 (1989).  Furthermore, the PBC Act empowers the PBC's Board of Commissioners to create such accounts as it may deem necessary for the sale of its bonds, but "[t]he monies in such accounts shall be applied in the manner provided by the resolution, the trust agreement or other contract with the bondholders."  See 50 ILCS 20/15 (West 2000).

In this case, even assuming 
arguendo
 that the City was not bound by the PBC bond ordinances (contrary to Section 21 of each lease), the PBC was bound by them.  Each bond resolution states that 
within a given period of time before the end of each fiscal year
, remaining surplus funds 
shall
 be credited 
pro rata
 to the next annual rental payment due from the City.  Each bond resolution also provides that 
no surplus funds shall be transferred
, and the PBC Board shall not authorize such transfers, 
within the period of time during which the surplus is to be credited pro rata to the next annual rental payment
.

PBC Resolution No. 3626 approved the transfer of surplus funds "subject to the approval of the City" on November 18, 1988--46 days before the end of the year.  The conditional nature of the approval is arguably not an authorization.  Moreover, the City Council did not pass an ordinance consenting to the fund transfers until February 1, 1989--a date well outside the time periods when the PBC is permitted to transfer the 1988 surplus for purposes other than rent under its own bond resolutions.  Nor has the City shown that the transfers were made to accounts to which transfers could be made under the bond resolutions.  The PBC had a legal duty to follow the procedures imposed by statute and its own bond resolutions; this court will not put its stamp of approval on a dereliction of that duty.
(footnote: 6)
 The City argues that the Objectors failed to show that they were harmed by the fund transfers.  The City claims that authorizing the fund transfers did not increase City property taxes, and that had the surpluses been applied to future rent payments, it would have been required to levy an amount through some other appropriation to pay for the maintenance of the Daley Center and the other projects.  However, the City has cited nothing in the record showing that these other charges would have necessarily been funded by property taxes.  Indeed, the fact that sums raised by property taxes were spent on charges not otherwise financed by property taxes suggests that the Objectors paid more property taxes that they would have paid absent the transfers.

In sum, the City has failed to show that the trial court erred in sustaining Objection 19.

B

The trial court also sustained Objection 24, which claimed that the City had grossly underestimated the surplus available for appropriation for 1989 applicable to the PBC Fund.  The trial court applied 
Central Illinois Public Service Co. v. Miller
, 42 Ill. 2d 542, 544, 248 N.E.2d 89, 90 (1969), which held a levy illegally excessive where the assets in the fund were two to three times greater than the expenditures from the fund.  The City maintains that 
Miller
 "has no application here" and alternatively that the trial court miscalculated the "
Miller
 ratio"of assets to expenditures.

In its reply brief, citing 
Alpha Gamma Rho Alumni v. People ex rel. Boylan
, 322 Ill. App. 3d 310, 750 N.E.2d 282 (2001), the City asserts that "under the home-rule provision of the Illinois Constitution, a home-rule municipality's tax levy is not subject to challenge unless it violates a state statute expressly limiting the home-rule power to tax."
(footnote: 7)  The City admits that its failure to assert this argument in its initial brief may result in waiver on appeal, but notes that 
Alpha Gamma Rho Alumni
 was decided approximately a month after the City filed its initial brief.  The City also notes that this court stated in that case that "[t]he issue of whether a home-rule unit's tax levy is subject to judicial review for abuse of discretion is one of first impression."  
Alpha Gamma Rho Alumni
, 322 Ill. App. 3d at 315, 750 N.E.2d at 289.  However, the record shows that the City raised home rule arguments in the trial court in response to Objections 8, 17 and 19.  It cannot be said that arguments based on home rule had not occurred to the City.

Even if this court were inclined to relax the waiver rule, the home rule argument would not have prevailed.  The Revenue Act of 1939, as amended in 1980, required the governing body of any taxing district receiving personal property replacement tax funds from the State, upon determin­ing that a surplus of funds was available for any fund, account or purpose, to adopt a resolution or ordinance reducing a tax levy for such district.  Ill. Rev. Stat. 1987, ch. 120, ¶ 638a; see 35 ILCS 200/18-20 (West 2000) (imposing a similar requirement on taxing districts receiving funds under Section 12 of the State Revenue Sharing Act).  The United States Supreme Court has held that Congress, in the exercise of its spending power, generally may attach conditions to the receipt of federal funds by states, including conditions which require that states enact or have enacted particular laws.  
E.g.
, 
South Dakota v. Dole
, 483 U.S. 203, 97 L. Ed. 171, 107 S. Ct. 2793 (1987) (upholding as against tenth amendment challenge requirement that States have particular minimum drinking age as a condition to receipt of federal highway funds).  

Similarly, in Illinois, the General Assembly is authorized by our constitution to make appropriations for all State expenditures of public funds.  Ill. Const.1970, art. VIII, § 2(b).  It follows that the State, in the exercise of its powers, generally may attach conditions to the receipt of its funds by others, including quasi-sovereign entities such as home rule units.  The City cites no authority suggesting that home rule powers extend to dictating the General Assembly's exercise of its own sovereign power.

In this case, the record shows that City received personal property replacement tax funds during the time at issue; thus, the City was bound by the statute.  Of course, a court construing a statute will assume that the legislature did not intend to produce an absurd  result.  
State Farm Fire & Casualty Co. v. Yapejian
, 152 Ill. 2d 533, 541, 605 N.E.2d 539, 542 (1992).  Surpluses are to be expected upon application of conservative budgeting practices; however, the taxpayers are prejudiced if such surpluses are not included in the following year's budget to reduce the appropriation and levy.  See 
Marotta
, 159 Ill. 2d at 406-07, 639 N.E.2d at 565.  

The General Assembly undoubtedly understands the uncertainties inherent in government budgets and projections as well as or better than Illinois courts.  Moreover, under the current system, "[t]he process of assessing property for taxation and the levy and extension of taxes against that property is a complex one involving thousands of taxing bodies and the cooperation of numerous public officers."  
Board of Ed. of Community Unit School Dist. No. 16 v. Barrett
, 67 Ill. 2d 11, 14, 364 N.E.2d 89, 91 (1977).  We presume that the General Assembly did not intend to require that all taxing districts receiving personal property replacement tax funds eliminate any and all surpluses immediately upon discovery, as such a requirement would likely throw the existing system for real property taxation into chaos.  Thus, we interpret the statute as it existed in 1989 consistent with the rules discussed in cases such as 
Miller
 and 
Marotta
.
(footnote: 8)  

The City relies on 
In re Application of McHenry County Collector (Walgenbach v. Chicago & Northwestern Rwy. Co.)
, 41 Ill. App. 3d 106, 110, 352 N.E.2d 42, 45 (1976), for the proposition that an abuse of discretion is shown only when the intent of the taxing body in making the levy is to provide a surplus for other purposes or is grossly excessive and shows an intent to accumulate funds faster than are likely to be needed.  However, this case meets those criteria.  In this case, the PBC Fund had a surplus approximately as large as the 1989 levy for that fund.  This surplus exceeded the average expenditures for the prior three years.  The City also apparently had sums ostensibly collected for rent payments applied to unrelated projects.

The City also relies on 
Belke v. County of Peoria
, 169 Ill. App. 3d 839, 523 N.E.2d 1295 (1988), to argue that 
Miller
 only applies where the taxing body had a continuing, accumulating surplus.  The discussion of 
Miller
 in 
Belke
 is 
dicta
, using concepts from 
Miller
 to discuss a statute that this court ultimately did not even apply in 
Belke
.  169 Ill. App. 3d at 844-45, 523 N.E.2d at 1298-99.  As such, 
Belke
 can hardly be considered to support the City's claim.  

More significantly, 
Miller
 is just one case reflecting long-standing Illinois law that a tax levied for a particular purpose is intended to provide for the needs of the ensuing year and not to provide a fund for possible future needs, rendering a tax levy largely in excess of the requirements for the particular purpose during the ensuing year illegal and void.  
E.g.
, 
People ex rel. Brenza v. Morrison Hotel Corp.
, 4 Ill. 2d 542, 547, 123 N.E.2d 488, 492 (1954) (and cases cited therein).  This rule is not based 
on a continuing, accumulating surplus.  Indeed, the objection in 
Miller
 was that the amount on hand in the general assistance fund, together with funds due from the previous year's levy, made a levy for the following year unnecessary and illegal.  
Miller
, 42 Ill. 2d at 543, 248 N.E.2d at 90.  The objection was not based on a pattern, but the ultimate accumulation.
(footnote: 9)
 The City argues in the alternative that the trial court miscalculated the 
Miller
 ratio.  The City presents a series of calculations that result in a 
Miller
 ratio of 1.87, adjustments that would show a 
Miller
 ratio of 1.59, and other adjustments that would result in a 
Miller
 ratio of 1.84.  One of the exhibits the City cites shows a series of calculations that result in a 
Miller
 ratio of 1.69.

The City's first objection to the trial court's calculation of the 
Miller
 ratio is that it did not count funds transferred out of the PBC accounts for purposes other than rent as expenditures.  The City argues that as a matter of budgetary accounting, transfers like those made in this case are expenditures.  The Objectors argue that under generally accepted accounting principles, the transfers were not expenditures.  

The City may have discretion to account for the transfers as expenditures as a budgetary matter, but it cannot unnecessarily accumulate monies in the public treasury.  Illinois law is particularly concerned with the unnecessary accumulation of taxes levied for one purpose where they may be unlawfully diverted to another purpose.  See, 
e.g.
, 
Marotta
, 159 Ill. 2d at 402, 639 N.E.2d at 563.  As noted above, neither the City nor the PBC could transfer the funds at issue in this case.  Thus, the City cannot argue that the transfers should affect the 
Miller
 ratio, as such a rule would encourage unlawful diversions of funds to avoid 
Miller
 claims.

The City's second argument is that the trial court improperly failed to subtract certain sums in the PBC surplus accounts from the numerator of the 
Miller
 ratio.  In this case, City Assistant Comptroller Steven Lux testified that the funds available to Fund 641 totaled $28,192,578, including approximately $14 million in surplus funds and approximately $14.1 million in revenue to be collected in 1989.  The appropriations ordinance budgeted $708,000 of the latter amount for loss in collection.  The $28 million figure was also the figure asserted by the City in its Exhibit 47, though the City attempted to move away from it in its motion to reconsider the ruling on Objection 24.  On appeal, the City seeks to present calculations designed to show that it only had $10,481,695 in surplus available for PBC purposes, not $14 million.

The City's argument may be explained by a chart the City included in its brief addressing the six series of bonds that had anticipated surpluses, the 1989 rent, and "excess credit":

Bond Series
 
Late 1988 Credit
 
Rent Due for 1989
 
"Excess Credit"

1971A:  $2,430,000       $48,615  $2,381,385

1971B:     $774,000  $2,457,867

1975A:       $38,400     $205,493

1975B:     $550,000  $4,070,292

1978A:  $6,550,000  $3,575,380  $2,974,620

1979A:     $120,000  $3,448,180

Total: $10,462,700 $13,805,827  $5,356,005

The City argues that the $5,356,005 in "excess credit" could not be applied to rent for later years.  In the City's view, only sums that could be applied to their respective accounts ($10,462,700 - $5,356,005 = $5,106,695) should have been considered in the numerator of the 
Miller
 ratio.  

The City does not show where it presented these calculations to the trial court, resulting in waiver on appeal.  Moreover, the premise of the City's argument is contradicted by City Assistant Comptroller Steven Lux.  Furthermore, section 8.1 of each bond resolution provides that "Any advance rentals shall be held in the Revenue Fund and invested and be applied to the payment of rent for the year 
or years
 for which the advance payment was made."  The City identifies no part of the lease barring advance payment for more than one year in the future, as contemplated by the bond resolutions made a part of each lease.

In sum, the City has not shown that the trial court erred in sustaining Objection 24.

V.  The Objectors' Cross-Appeal

The Objectors cross-appeal the dismissal of Objection 23, which claimed that the City illegally transferred a $30.1 million surplus from the Bond Redemption and Interest Fund (Fund 510) to the general Corporate Fund.  The City had moved to dismiss pursuant to section 2-619 of the Illinois Code of Civil Procedure, which provides a means of obtaining summary disposition of issues of law or easily proved issues of fact.  
Kedzie & 103rd Currency Exchange, Inc. v. Hodge
, 156 Ill. 2d 112, 115, 619 N.E.2d 732, 725 (1993).  The City's motion does not state which subsection of section 2-619 forms the basis of the motion, but subsection (a)(9) generally permits dismissal where the asserted claim is barred by other affirmative matter avoiding the legal effect of or defeating the claim.  735 ILCS 5/2-619(a)(9) (West 2000);  
Kedzie
, 156 Ill. 2d at 115, 619 N.E.2d at 735.  "Affirmative matter" encompasses any defense other than a negation of the essential allegations of the cause of action.  
Kedzie
, 156 Ill. 2d at 115, 619 N.E.2d at 735.

The defendant has the burden of proving the affirmative matter relied upon, and the motion should only be granted if the record establishes that no genuine issue of material fact exists.  
Streams Condominium No. 3 Ass'n v. Bosgraf
, 219 Ill. App. 3d 1010, 1013-14, 580 N.E.2d 570, 573 (1991).  Conclusions of law or of fact not supported by allegations of specific fact are not admitted.  
Lawson v. City of Chicago
, 278 Ill. App. 3d 628, 634, 662 N.E.2d 1377, 1382 (1996).  The standard of review is 
de novo
.  
Owens v. McDermott, Will & Emery
, 316 Ill. App .3d 340, 344, 736 N.E.2d 145, 150 (2000).

The City's motion to dismiss argued that the amount of the levy for Fund 510 for a given year is determined by the amounts specified in bond ordinances which state amounts for years far into the future.  The City chose not to support its motion by submitting any of the relevant bond ordinances, stating in a footnote that the City believed it was not required to do so.  The City also asserted that it "is not free to change each year the amount of property taxes that will be levied for the debt service on those bonds," but cited no authority or evidence to support this assertion.  

Even assuming 
arguendo
 that the City's assertion regarding the inviolability of its bond ordinances is correct, the Objectors' response to the motion to dismiss claims that the surplus accumulated due to overestimates for loss in collections, not the underlying figures upon which the estimates are based.  The Objectors relied on portions of the City's CAFRs for 1987-89.

Similar to other funds allocated for a particular purpose, a surplus created by an overestimate for loss in collections "should be kept separate and paid out, not for the general expenses of the county, but for any loss in collections cushion the taxing body may need in the future."  See 
People ex rel. Stuckart v. N.J. Sandberg Co.
 277 Ill. 567, 571, 115 N.E. 741, 743 (1917).  This rule distinguishes this case from the diversion claim rejected in 
Marotta
, where the objector failed to show a misapplication of funds.  
Marotta
, 159 Ill. 2d at 405, 639 N.E.2d at 564.  If the Fund 510 surplus arose from loss in collections, it cannot be diverted to other purposes.

The City's reply brief notes that the alleged overestimate of loss in collections was the subject of Objection 20.  However, the City does not make clear whether the $30.1 million transferred from Fund 510 was already counted in sustaining Objection 20. 

The City's motion to dismiss also claimed that the Objectors were not damaged by the transfer of the funds.  However, assuming 
arguendo
 that the Objectors were required to show  damages, the City's argument is an alleged negation of the essential allegations of the cause of action.  Moreover, the City's bare assertion that taxes would have otherwise been imposed to pay for their planned expenditures is conclusory and not a basis for affirming the dismissal.

The City argues that the transfer at issue was a permissible exercise of its home rule powers.  However, as the analysis above shows, the City was bound to use surpluses to reduce the following year's tax levy for loss in collections, and could not divert the taxes ultimately collected to another purpose.

In sum, the record shows that material questions of fact remain regarding Objection 23.  Accordingly, the trial court erred in dismissing it.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed as to Objections 17, 19, and 24, reversed as to Objections 14, 20, and 23, and remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded.

GREIMAN and QUINN, JJ., concur.

FOOTNOTES
1:  The record shows that the City's pretrial brief for Objection 17 addressed the question of whether the City complied with statutory requirements regarding the level of disclosure for its appropriations and levy ordinances because the trial court had expressed interest in it during the hearing on the Objectors' motion to amend Objection 17.  Moreover, the transcript of proceedings shows that the City's closing argument on Objection 17 was largely devoted to the issue.  Thus, the City cannot claim any unfair surprise on this point.

Indeed, citing Ill. Rev. Stat. 1987, ch. 24, § 8-3-1, the City states in its brief that the manner in which tax levy ordinances must describe the levy is governed by section 8-3-1 of the Illinois Municipal Code.  As section 8-3-1 requires detailed appropriations, the City's complaint regarding the trial court's comments on the disclosure issue is not well-taken.

2:  The Note Ordinance directed the issuance of Series 1989B notes for the purpose of the City Relief Fund in the maximum principal amount of $15,869,000.

3:  One of the citations the City gives to support its $18,710,685 figure is its Exhibit 18, which is a calculation that the total city relief appropriation was $18,131,203 (the sum of the initial appropriation to Fund 660 and the $400,000 supplemental appropriation).  This calculation was not a part of any official record and appears to have been created for the purpose of the litigation.  A figure of $18,710,685 cannot be found in Exhibit 18; an attached page from the City's 1989 CAFR refers to $15,869,000 as proceeds of debt for Fund 660, but this page does not refer to Fund 512, let alone provide an itemized allocation of Fund 512.  The City also cites its 1989 appropriations ordinance, but identifies no page thereof supporting its calculation.

As for the $400,000 supplemental appropriation, we note that the validity of a tax levy must be determined as of the time it was made.  
People ex rel. Harding v. Chicago & N.W. Ry. Co.
, 340 Ill. 102, 105, 172 N.E. 13, 15 (1930).

4:  The Objectors claim that 
Marotta
 stands for the proposition that "when an historical pattern of overstating expenditures or understating revenues can be shown the tax levy is objectionable as against public policy."  A reading of 
Marotta
 shows that the supreme court addressed historical patterns in the context of the separate claim of an unnecessary accumulation or illegal diversion of taxes.  See 
Marotta
, 159 Ill. 2d at 402-08, 639 N.E.2d at 563-65.  Another case the Objectors cite, 
People ex rel. Toman v. Signode Steel Strapping Co.
, 380 Ill. 633, 44 N.E.2d 555  (1942), is discussed in the part of 
Marotta
 addressing the unnecessary accumulation or illegal diversion claim.  
Marotta
, 159 Ill. 2d at 404-05, 639 N.E.2d at 564.  The Objectors themselves note that Objection 14 is not an unnecessary accumulation or illegal diversion claim.

5:  A number of the objections dismissed, but not appealed, raised similar issues.

6:  Indeed, as the Objectors suggest, permitting the PBC or any other municipal corporation to ignore the procedural protections of resolutions like this would likely have a deleterious effect on the ability of municipal corporations to finance projects through debt or the interest rate that would have to be offered to successfully market its debt.

7:  The City also argues in its reply brief that its home rule argument applies to Objections 14 and 20.  A court should avoid constitutional issues, unless addressing them is necessary to dispose of a case.  See, 
e.g.
, 
East St. Louis Federation of Teachers, Local 1220, American Feder­a­tion of Teachers, AFL-CIO v. East St. Louis School Dist. No. 189 Financial Oversight Panel
, 178 Ill.2d 399, 408, 687 N.E.2d 1050, 1056-57 (1997).  As this court is reversing the trial court as to Objections 14 and 20, discussion of the home rule issue was not necessary.  Interestingly, as noted in the text above, the City 
did
 raise home rule in trial court as a response to Objection 17, involving the City Relief Fund – an objection that implicates a state statute placing conditions on the receipt of public funds by local governments.

8:  In addition, "[p]ublic funds, property or credit shall be used only for public purposes."  Ill. Const.1970, art. VIII, § 1.  In this context, our supreme court has reaffirmed 
Miller
 and the principle that it is unconstitutional to impose unnecessary taxes.  
Geja's Café v. Metropolitan Pier and Exposition Authority
, 153 Ill. 2d 239, 263-64, 606 N.E.2d 1212, 1223 (1992).

9:  The 
Miller
 court's sole reference to a continuing, accumulating surplus was to state that "the real reason for continuing to accumulate further surpluses is the belief that if no levy is made the town will not be eligible for a State supplement in case of some unusual demand for assistance."  
Miller
, 42 Ill. 2d at 544, 248 N.E.2d at 91.  The 
Miller
 court then noted that the loss of state aid was not a valid reason to continue "to make levies which result in abnormal accumulation of funds," the Public Assistance Code addressed the issue.  
Miller
, 42 Ill. 2d at 544-45, 248 N.E.2d at 91.