GEORGE W. CRICHFIELD *et al.*

*v.*

THE BERMUDEZ ASPHALT PAVING COMPANY.

*Opinion filed October 24, 1898.*

1. CONTRACTS—*rule forbidding contracts to secure legislation applies to city councils.* The rule which makes void a contract for a contingent compensation for obtaining legislation applies as well to the common council of a city as to the legislature of a State.

2. SAME—*contract to promote passage of paving ordinances for private gain is against public policy.* A contract between an individual and a paving company, whereby the former, in effect, agrees to promote the passage of special assessment ordinances for paving streets and alleys,—not to secure to the public a needed improvement, but to enable the paving company to obtain contracts,—is against public policy and cannot be enforced.

3. SAME—*contracts tending to corrupt public officials are illegal.* If the performance of the obligations of a contract has an evil tendency, or furnishes temptation to use improper influence with public officials, the contract is illegal and *contra bonos mores,* whether the parties were actually guilty of improper conduct or not.

4. SAME—*contract is void if part of entire consideration is illegal.* If part of the entire consideration for a promise, or any part of a promise, to perform an entire undertaking is illegal, either by statute or at common law, the contract is void.

5. PLEADING—*court will take notice of illegality of contract though the same is not pleaded.* Where a contract is in its terms *contra bonos mores,* the court will so adjudge it although the defendant has not raised the defense of illegality by his pleadings, as in such case there can be no waiver, the defense being allowed for the sake of the law, and not for the benefit of the parties.

*Bermudez Asphalt Paving Co.* v. *Crichfield,* 62 Ill. App. 221, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JOHN BARTON PAYNE, Judge, presiding.

This is an action in assumpsit, brought by the appellants against the appellee company to recover compensation claimed to have been earned by them under the agreement, dated April 17, 1894, hereinafter set forth,

The declaration consisted of the common counts with an affidavit of claim.    Attached to the common counts was a copy of the said agreement or contract.    The appellee pleaded the general issue.

The contract in question was introduced in evidence. Witnesses were examined.    The trial took place before the court and jury.    The jury found the issues for the plaintiffs below and assessed their damages at $5115.41. Motion for new trial was entered, and, plaintiffs having remitted the sum of $489.27 from the amount of the verdict, the motion for new trial was overruled; also a motion in arrest of judgment was overruled; and judgment was rendered upon the verdict for the sum of $4626.14 and costs.    An appeal was taken from this judgment to the Appellate Court.    The Appellate Court has reversed the judgment of the Superior Court of Cook county, where the cause was tried below, and entered judgment in favor of the present appellee, the defendant in the trial court, and the appellant in the Appellate Court.    This appeal is prosecuted from such judgment of the Appellate Court.

The agreement referred to is as follows:

"This agreement, made and entered into on this the seventeenth (17th) day of April, 1894, by and between the Bermudez Asphalt Paving Company, a corporation organized under the laws of the State of Illinois, with principal office in the city of Chicago, party of the first part, and George W. Crichfield and W. T. S. Crichfield, of the city of Chicago, county of Cook, State of Illinois, parties of the second part:

"*Witnesseth*—That the said party of the first part has this day contracted to employ said parties of the second part as its agents to solicit and promote the asphalt paving business in the city of Chicago, on the following terms and conditions, to-wit:

"SEC. 1. This agreement is to the effect that the said parties of the second part shall be and continue in the employ of said party of the first part as its agents, for

the purpose of promoting the asphalt paving business in said city of Chicago, and shall devote their whole time, attention and best energies in and about the business of promoting asphalt paving in said city of Chicago, as the party of the first part may direct. And it is a part of the consideration of this agreement and the essence of the same, that the said parties of the second part shall continue in the employ of said party of the first part for and during a period of not less than one year from date hereof.

"SEC. 2. Said party of the first part agrees to pay to said parties of the second part the sum of seventeen and one-half (17½) cents per square yard for all asphalt paving which may be promoted by them and for which a contract or contracts may be made and entered into in the city of Chicago, and said party of the first part shall further pay to said parties of the second part one-half (½) of the excess in the prices of curb or of the combination curb and gutter which may be secured by said party of the first part, over and above the prices at which said party of the first part sub-let the same to contractors of curb or combination curb and gutter: *Provided, however,* that any work which may be promoted by the said parties of the second part and for which said party of the first part shall fail to secure the contract, then no payment for said work shall be made by said party of the first part: *Provided further*, that if said party of the first part shall secure the contracts for work which have not been promoted by them or by their agents, then and in that event it shall be their duty and it is hereby agreed that they will pay to the said parties of the second part their full commission on such an amount of such work as will equal the amount of work which may have been promoted by said parties of the second part and for which contracts were not secured by said party of the first part, it being the true meaning and intention of this agreement, that if said parties of the second part pro-

mote a given amount of asphalt paving and curb and gutter, then in that event they shall be paid for such amount of work, provided that said party of the first part shall secure contracts for said amount of work or for an equal amount of work.

"SEC. 3. The payment of commissions by said party of the first part to said parties of the second part shall be made upon the basis of the estimated amount of work for each contract, as and at the time the same shall be awarded by the city of Chicago, and when the work is actually done and the amount of work is actually ascertained a final settlement shall then be made, at which time, if it appears that the contract contained more or less work than that estimated, settlement shall be made accordingly for the actual amount of the work when finally ascertained, and if payment for a greater amount has been made the said parties of the second part shall refund the same, and if for a less amount, payment shall be made to them accordingly.

"SEC. 4. It is further understood and agreed that said party of the first part guarantees to the said parties of the second part the following sums of money, to-wit: To the said George W. Crichfield the sum of one hundred and twenty ($120.00) dollars per month, and to the said W. T. S. Crichfield the sum of eighty ($80.00) dollars per month, and the said sums of money shall be paid to them monthly. The amount herein guaranteed is to be deducted from commissions payable as they accrue, but said guarantee is to be paid at all events as herein stipulated. Nothing shall be paid on account of percentage for work promoted, to said parties of the second part, until the amount of work promoted, in the manner herein indicated and at the price herein named, shall exceed the sum total drawn on the guarantees herein specified. This guarantee shall constitute a lien in equity on any work for which ordinances shall have been passed prior to the 17th day of April, 1895.

"SEC. 5. It is further understood and agreed that all incidental expenses and trouble which said parties of the second part may incur in promoting said work or in aiding and assisting in the election of officials, or in any other matter pertaining to the promotion of asphalt paving or of curb and gutter, as herein specified, shall be borne by said parties of the second part. It is further agreed that the said parties of the second part shall promote all the paving herein provided for in Bermudez asphalt, or for any other material which may be directed by said party of the first part.

"In witness whereof, said parties have hereunto set their hands and seals this the seventeenth (17th) day of April, 1894, executed in triplicate.

BERMUDEZ ASPHALT PAVING CO.,
By FRANCIS AGNEW, *President.*

{ Bermudez Asphalt
Paving Co.
Seal. }

GEORGE W. CRICHFIELD,
W. T. S. CRICHFIELD.

Attest: JOHN P. AGNEW, *Secretary.*

"Witness to all signatures: JAS. R. B. VANCLEAVE."

PRENTISS, HALL & GREGG, and SHOPE, MATHIS, BARRETT & ROGERS, (SIMEON P. SHOPE, of counsel,) for appellants:

The sacred and inviolable nature of contracts was strongly impressed on the founders of the government, and the constitution of the United States was made to contain a provision, which was copied in our State constitution and in that of most other States, to the effect that the legislative department shall pass no law impairing the obligation of contracts. *People* v. *Canal Trustees,* 14 Ill. 402; *Kinney* v. *Sherman,* 28 id. 520.

This prohibition of the constitution applies not only to the State legislature, but also with equal force to the court, and no court has a right, by its decision, to accomplish indirectly what the legislature is positively forbidden to do. *Harmon* v. *Auditor,* 123 Ill. 122.

The design to prejudice public interests must clearly appear to warrant a court in denouncing a contract as void.    Greenhood on Public Policy, 116.

The power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.    *Richmond* v. *Railroad Co.* 26 Iowa, 191:

A contract to do what the law forbids cannot be enforced, whether it be *malum in se* or only *malum prohibitum;* but to fall within the rule, contracts of service must be done directly in furtherance of an illegal or immoral object.    It must be the inevitable result of the labor, or the party must have done the act in furtherance of the illegal purpose.    14 Am. & Eng. Ency. of Law, 785.

GURLEY & WOOD, and WILLIAM J. DONLIN, for appellee:

It is an undoubted principle of the common law that it will not lend its aid to enforce a contract to do an act that is illegal, or one inconsistent with sound morals or public policy, or which tends to corrupt or contaminate, by improper influences, the integrity of our social or political institutions.    *Marshall* v. *Railroad Co.* 16 How. 314.

Contracts for the purchase of the influence of private persons upon the action of public officials, either executive or legislative, are against public policy and void. It is sufficient that their tendency is bad.    *Liness* v. *Hesing*, 44 Ill. 113; *Trist* v. *Child*, 21 Wall. 441; 3 Am. & Eng. Ency. of Law, 877, 878; *Doane* v. *Railway Co.* 160 Ill. 22; *Brown* v. *Brown*, 34 Barb. 533.

If any part of the entire consideration for a promise, or any part of an entire promise, be illegal, whether by statute or common law, the whole contract is void.    *Gray* v. *Hook*, 4 N.Y. 449; *Meguire* v. *Corwine*, 101 U.S. 108; *Webster* v. *Sturges*, 7 Ill. App. 560; *Powers* v. *Skinner*, 34 Vt. 281.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The Appellate Court reversed the judgment of the court below, upon the ground that the agreement sued on in this cause was against public policy and void, and that, therefore, the appellants were not entitled to recover upon the same. The only question, which we deem it necessary to discuss in the case, is, whether the contract sued on is such a contract as the courts will refuse to enforce. If it is a contract which is against public policy, the maxim *ex turpi causa non oritur actio* applies.

*First*—A careful examination of the contract leads to the conclusion, that the appellants entered into the service of the appellee as lobbyists, or, in the language of some of the cases, as log-rollers. The contract recites, that the appellee company had, on the day of its date, contracted to employ appellants, as its agents to "solicit and promote" the asphalt paving business in the city of Chicago on certain terms and conditions therein named. Section 1 provides, that the appellants are to continue in the employ of the appellee as its agents for the purpose of promoting the asphalt paving business in the city of Chicago, and shall devote their whole time, attention and best energies in and about such business, as the appellee may direct; and that the appellants shall continue in such employ for and during a period of not less than one year from April 17, 1894. Section 2 provides, that the appellee shall pay the appellants 17½ cents per square yard for all asphalt paving, which may be promoted by them, and for which a contract or contracts may be made and entered into in the city of Chicago, and shall further pay them one-half of the excess in the prices of curb, etc., as stated in the agreement. This section shows clearly that the amount therein agreed to be paid was only to be paid for paving, for which contracts should be entered into in the city of Chicago. The

contracts to be made and the paving to be done were, by the terms of the agreement, to be confined to the city of Chicago. The first proviso to section 2 is to the effect that, as to any work, which may be "promoted" by the appellants, and for which the appellee shall fail to secure a contract, no payment shall be made by the appellee. It thus appears, that the compensation agreed to be paid by section 2 was contingent upon the obtaining of the contract or contracts for paving from the city of Chicago. Section 2 further provides, that, if the appellants "promote" a given amount of asphalt paving and curb and gutter, then, in that event, they shall be paid for such amount of work, provided the appellee shall secure contracts for said amount of work, or for an equal amount of work. This latter provision also shows, that the compensation agreed to be paid by section 2 was dependent upon the contingency, that the appellee should secure the paving contracts in the city of Chicago. Section 3 shows, that the contracts referred to were not only to be made in the city of Chicago, but were to be made by the city of Chicago with the appellee. The language of section 3 is: "The payment of commissions by said party of the first part to said parties of the second part shall be made upon the basis of the estimated amount of work for each contract, as and at the time the same shall be awarded by the city of Chicago," etc. Contracts for paving made with the city of Chicago would necessarily be for the paving of public streets or alleys. The contract in question is, therefore, one which requires the appellants to "solicit and promote" contracts between the appellee and the city of Chicago for the paving of the public streets and alleys of the city.

By the terms of section 4 appellee guarantees to the appellant, George W. Crichfield, the sum of $120.00 per month, and to the appellant, W. T. S. Crichfield, the sum of $80.00 per month; and agrees that said sums of money shall be paid to them monthly. Section 4 provides, that

the guaranty therein referred to shall constitute a lien in equity on any work for which ordinances shall have been passed prior to the 17th day of April, 1895. It thus appears from the language of the contract itself, that a part of the duty of the appellants was to procure the passage of ordinances providing for the paving of the public streets and alleys.

Section 5 of the contract is as follows: "It is further understood and agreed that all incidental expenses and trouble which said parties of the second part (appellants) may incur in promoting said work, or in aiding and assisting in the election of officials or in any other matter pertaining to the promotion of asphalt paving, or of curb and gutter, as herein specified, shall be borne by the parties of the second part" (appellants). By section 5 "it is further agreed that the appellants shall promote all the paving therein provided for in Bermudez asphalt or for any other material which may be directed by said party of the first part" (appellee).

In order to understand the precise nature of the services agreed to be performed under the contract in question, it will be necessary to refer briefly to some of the provisions of article 9 of the City and Village act. When a public street is to be improved by the paving thereof in the city of Chicago, the first step is the passage by the common council of the city of an ordinance for the improvement. The council then appoints three of its members or three other competent persons to estimate the cost of the improvement contemplated, such persons to report the same in writing to the council. When such report is made and approved by the council, the council may order a petition to be filed in the county court for proceedings to assess the cost of such improvement in the manner provided by the act. The petition shall be in the name of the corporation, and shall recite the ordinance for the proposed improvement, and the report of such commission, and shall pray that the cost of the im-

provement be assessed in the manner prescribed by law. The act then describes and fixes the duties of the commissioners, the assessment of benefits, the preparation of the assessment roll, the giving of notice and proof of notice.   Any person, interested in any real estate to be affected by the assessment, may appear and file objections to the report.   As to all matters as to which objections are not filed within the time ordered by the court, default may be entered, and the assessment confirmed by the court.  Provision is made for the hearing of the report of the commissioners and the evidence in the case, as in other cases at law, and the court shall find the amounts for which the premises ought to be assessed and enter judgment accordingly.  The court is given power, at any time before final judgment, to modify or confirm any assessment returned, or cause the same to be re-cast, etc. The judgment, which is rendered, is to be certified by the clerk of the court, together with the assessment roll, to the officer of the city authorized to collect special assessments.  Section 49 provides, that "all persons taking any contracts with the city or village, and who agree to be paid from special assessments, shall have no claim or lien upon the city or village, in any event, except from the collections of special assessments made for the work contracted for."   Section 50 provides that "all contracts for the making of any public improvement, to be paid for in whole or in part by a special assessment, and any work or other public improvement, when the expense thereof shall exceed $500.00 shall be let to the lowest responsible bidder, in the manner to be prescribed by ordinance— such contracts to be approved by the mayor or president of the board of trustees: *Provided, however*, any such contract may be entered into by the proper officer without advertising for bids, and without such approval, by a vote of two-thirds of all the aldermen or trustees elected."

These provisions of the statute and the terms of the contract sued upon, when considered in connection with

each other, clearly lead to the conclusion that appellants, in agreeing to obtain paving contracts for the appellee with the city of Chicago, at the same time agreed to look to the passage of ordinances by the common council, and also to look to the letting of contracts, following upon the passage of such ordinances in accordance with the statutory provisions above set forth. Upon the face of the contract the meaning of the expression "to solicit and promote the asphalt paving business in the city of Chicago" is to solicit, by the exercise of influence and other means, the passage of ordinances and the letting of contracts by the members of the common council of the city of Chicago. The evidence of the appellants themselves confirms the interpretation thus given to the contract. The testimony of the appellants shows what they meant by "promoting" the asphalt paving business. The appellant, George W. Crichfield, says, that the methods, adopted for promoting such business, included "the influencing of a public sentiment in favor of that kind of improvement which will result in the passage of ordinances, the making of assessments and the making of contracts." He says that he took whatever step he deemed advisable, that was honorable and fair, for the purpose of securing the paving of streets with asphalt. He admits in his testimony, that, in some cases, he saw the aldermen to get them to favor the passage of ordinances, and in some cases he did not see them. He also says that he was occasionally present at the council meetings when these ordinances came up. W. T. S. Crichfield testifies, that he usually followed the ordinance up to see "that it was properly drafted, and to see that it was passed, and that the proceedings were straight, and that, when the assessment was ready, if any objections were filed against the paving of the streets with asphalt, he would make an endeavor to get the objectors to withdraw the objections, and get the assessment confirmed, and get the contract passed."

The language of section 5 is especially significant. From that section it appears that the appellants were to incur expenses in aiding and assisting in the election of officials. This part of the contract may be fairly interpreted to mean, that members of the common council were to be elected, who should favor the awarding of paving contracts to the appellee. The evidence shows that the appellant, George W. Crichfield, received, under this contract, from the appellee $5432.00, and that W. T. S. Crichfield received $4240.00, making $9672.00. The evidence tends to show that they also received other moneys besides those thus mentioned. In addition to this, they claim in this case $5115.41.

*Second*—There are some salient features of this agreement which stamp it as being against public policy. A special assessment for a public improvement under our statute is a species of taxation, and is authorized only as an exercise of the taxing power. A special assessment should not be levied, except for the purpose of making a needed public improvement. The property owner should not be assessed and his property made to bear the burden of taxation, except to secure the benefits of a needed public improvement. The making of a contract to promote the levying of a public assessment, not for the purpose of securing to the public a needed improvement, but for the purpose of enabling a paving company to get a job, is not only against the public interest, but is abhorrent to all proper ideas of justice and honor. Property owners should not be assessed for the purpose of paying moneys into the pockets of paving contractors, and any contract, by which parties agree to obtain ordinances by solicitation and by the exercise of influence upon public officials, and with a view of obtaining contracts which result in the end from the passage of such ordinances, is against public policy, and will not be enforced by the courts. It makes no difference whether the parties were actually guilty of bribery and corrup-

tion under the contract or not. If the performance of the obligations imposed by the contract has an evil tendency or furnishes a temptation to use improper means, the contract is illegal and *contra bonos mores.*

One of the striking features of this contract is, that, with the exception of the monthly allowance to be paid to the appellants, the compensation to be received by them is contingent upon their success in obtaining the necessary legislation for the levying of special assessments, and in securing the paving contracts consequent thereupon.

In *Marshall* v. *Baltimore and Ohio Railroad Co.* 16 How. 314, a special contract was sued upon, whereby the plaintiff was employed to attend the sessions of the legislature of Virginia, in order to superintend and further any application or other proceeding to obtain the right of way through the State of Virginia on behalf of a railroad company; and the Supreme Court of the United States there said: "Bribes, in the shape of high contingent compensation, must necessarily lead to the use of improper means and the exercise of undue influence. Their necessary consequence is the demoralization of the agent who covenants for them; he is soon brought to believe that any means which will produce so beneficial a result to himself are 'proper means;' and that a share of these profits may have the same effect of quickening the perceptions and warming the zeal of influential or 'careless' members in favor of his bill. The use of such means and such agents will have the effect to subject State governments to the combined capital of wealthy corporations, and produce universal corruption, commencing with the representative and ending with the elector." The court further say in that case: "It is an undoubted principle of the common law, that it will not lend its aid to enforce a contract to do an act that is illegal; or which is inconsistent with sound morals or public policy; or which tends to corrupt or contaminate, by improper influences, the integ-

rity of our social or political institutions.   *   *   *   It is the interest of the State that all places of public trust should be filled by men of capacity and integrity, and that the appointing power, committed to the executive, should be exercised as free from any improper bias or influence as the trial of the convict before the court. *   *   *   Legislators should act from high considerations of public duty.   Public policy and sound morality do therefore imperatively require, that courts should put the stamp of their disapprobation on every act, and pronounce void every contract the ultimate or probable tendency of which would be to sully the purity or mislead the judgments of those to whom the high trust of legislation is confined.   *   *   *   Legislators should act with a single eye to the true interest of the whole people, and courts of justice can give no countenance to the use of means, which may subject them to be misled by the pertinacious importunity and indirect influences of interested and unscrupulous agents or solicitors."   The court, after referring to a large number of cases, concludes as follows:   "The sum of these cases is, that all contracts for a contingent compensation for obtaining legislation, or to use personal or any secret or sinister influence on legislatures, is void by the policy of the law."

It is clear to our minds, that the contract now under consideration is a contract which provides for a contingent compensation for obtaining ordinances for paving. An ordinance passed by the common council, providing for the paving of a public street, is a species of legislation, as much as an act passed by the legislature; though the body passing it is subordinate in its character and created by the legislature itself.   The rule, therefore, which makes void a contract for a contingent compensation for obtaining legislation, applies as well to the common council of a city, as to the legislature of a State.

In *Gill* v. *Davis*, 12 La. Ann. 219, the Supreme Court of Louisiana say:   "We believe it has been uniformly held

that a contract for a contingent compensation for obtaining an act of the legislature is void by the policy of law. It is not necessary that improper influences should have been used in a particular case to affect such a contract with nullity. The law looks to the general tendency of things; it opposes the beginnings of evil; it shuts the door against temptation by sweeping rules, which admit of no evasions."

In *Doane* v. *Chicago City Railway Co.* 160 Ill. 22, we said (p. 32): "Contracts for the purchase of the influence of private persons upon the action of public officials, either executive or legislative, are against public policy and void. It is sufficient that their tendency is bad. * * * Personal influence to be exercised over a legislative body is not vendible in our system of law and morals." (*Liness* v. *Hesing*, 44 Ill. 113; *Trist* v. *Child*, 21 Wall. 441; 3 Am. & Eng. Ency. of Law, 877, 878, and notes; *Brown* v. *Brown*, 34 Barb. 533; *Oscanyan* v. *Arms Co.* 103 U. S. 261.) It is true that an agreement, express or implied, for purely professional services will be held to be valid; but such services are clearly distinguishable from that personal solicitation which is usually practiced by all paid lobbyists in the prosecution of their business. (*Trist* v. *Child, supra.*) It is true also, that a person may be employed to conduct an application to the legislature, when he prepares documents, collects evidence, makes statements of facts, or prepares or makes oral or written arguments before the legislature itself, or some committee thereof as a body. But the present contract provides for no such open and legitimate mode of presenting the subject of asphalt paving to the common council of the city of Chicago. Considerations looking to the public good should alone control the common council in making public improvements. No other consideration can lawfully enter into the passage of ordinances for public improvements. This is the rule of public policy, "and whatever tends to introduce any other elements into the transac-

tion, is against public policy.  That agreements, like the
one under consideration, have this tendency, is manifest.
They tend to introduce personal solicitation, and personal
influence, as elements in the procurement of contracts;
and thus directly lead to inefficiency in the public ser-
vice, and to unnecessary expenditures of the public
funds." (*Tool Co.* v. *Norris*, 2 Wall. 45.)

Counsel say, that the expenses and trouble which are
contemplated by section 5, and the object of which is
to aid and assist in the election of officials, may not be
incurred or suffered.   In other words, it is said that the
means provided for in section 5 for accomplishing the
objects and purposes of the contract need not necessarily
be resorted to, and may not be resorted to.  But section 5
is as much a part of the contract as any other clause
thereof.  The contract provides for a contingent compen-
sation, largely in excess of the fixed compensation, and
which, as the facts show in this case, has amounted to
a very large sum of money, including what has already
been paid and what is here sued for.   It is the natural
inference that such large compensation was provided for
in order to meet just such expenses as are specified in
section 5.  The services mentioned in section 5 are a part
of the consideration to be given by appellants for the
compensation to be paid them.  In *Henderson* v. *Palmer*, 71
Ill. 579, we held, that, if any part of the entire considera-
tion for a promise or any part of an entire promise, be
illegal, whether by statute or common law, the whole
contract is void.   Where there are provisions in a con-
tract for a compensation which is just, yet if those pro-
visions are blended and confused with others which are
forbidden, the whole contract is a unit and indivisible.
That which is bad destroys that which is good and they
perish together. (*Trist* v. *Child, supra*).  Here, the obli-
gation to secure the necessary legislation in the form of
ordinances is so necessarily commingled with the other
duties of the appellants under the contract, that it can

not be separated therefrom. "All agreements for pecuniary considerations to control the ordinary course of legislation are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution." (*Tool Co.* v. *Norris*, *supra*). That part of the present agreement, which gives a pecuniary consideration to the appellants in order to enable them to control the passage of ordinances by the common council of the city of Chicago, is unquestionably void as against public policy; and, being commingled with whatever may otherwise be held to be valid, cannot but be regarded as part of an entire consideration. "It matters not that nothing improper was done or was designed to be done by the plaintiff. It is enough that such is the tendency of the contract, that it is contrary to sound morality and public policy, leading necessarily, in the hands of designing and corrupt men, to improper tampering with members, and the use of extraneous influence over an important branch of the government." (*Clippinger* v. *Hepbaugh*, 5 W. & S. 315; *Ordineal* v. *Barry*, 24 Miss. 9; *Bryan* v. *Reynolds*, 5 Wis. 200; *Shenk* v. *Phelps*, 6 Ill. App. 612; *Elkhart Co. Lodge* v. *Crary*, 98 Ind. 238).

Counsel claim that the conditions of modern life are widely different from those of the times immediately preceding us, and that, in view of the revolutions in business methods which have taken place in modern times, what was decided to be against public policy in the past generations may be a common and ordinary method of doing business to-day, which is approved by the common sense of men. That which is against public morals and public decency should be subject to the condemnation of the courts, in all generations. Righteousness is the same to-day as it was yesterday. The refinements of modern civilization may have increased the forms of bribery and corruption and made them more dangerous and insinuating, but they none the less merit the reprobation of honest men.

*Third*—It is urged that the question of the invalidity of this contract is not raised by the pleadings in the court below, nor by objections to the introduction of evidence.   Where a contract is in terms *contra bonos mores*, it is not necessary for the defendant to plead the objections.   A court will not proceed to judgment upon it, even where both parties assent thereto.   In such cases there can be no waiver.   The defense is allowed not for the sake of the parties, but for the sake of the law itself. "The principle is indispensable to the purity of its administration.   It will not enforce what it has forbidden and denounced.   The maxim, *ex dolo malo non oritur actio*, is limited by no such qualification.   Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case.   No consent of the defendant can neutralize its effect.   A stipulation in the most solemn form to waive the objection would be tainted by the vice of the original contract, and void for the same reasons.   Wherever the contamination reaches, it destroys.   The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded on its violation." (*Shenk* v. *Phelps, supra; Coppell* v. *Hall*, 7 Wall. 542; *Collins* v. *Blantern*, 1 Smith's L. C. 630, and notes).   Where an action is founded upon an illegal contract the law will leave the parties where it found them, and grant no relief to either of them.

In *Wright* v. *Rindskopf*, 43 Wis. 344, which was an action begun for a failure to perform a contract, one of the considerations of which was an agreement to stifle prosecution, the point that this agreement was contrary to public policy was not raised in the pleadings or at the trial in the court below.   But the Supreme Court of Wisconsin took cognizance of the question, saying in their opinion: "The learned counsel for the respondent contended that the question of the invalidity of the contract, as against public policy, relied on by the appellant, is not in the

case, because the answer does not raise it. And he cited some cases here and elsewhere, to sustain the position. But we do not think that they do so. They recognize the general doctrine, that when a contract, valid on its face, is impeached for fraud, the extrinsic facts going to the consideration only, must be specially pleaded. They do not hold,—we know of no case which does,—that when a contract is in terms *contra bonos mores*, it is necessary for the defendant to plead the objection; or that a court will proceed to judgment upon it, both parties even assenting. If the objection be not made by the party charged, it is the duty of the court to make it on its own behalf. Courts owe it to public justice and to their own integrity, to refuse to become parties to contracts essentially violating morality or public policy, by entertaining actions upon them. It is judicial duty always to turn a suitor upon such a contract out of court, whenever and however the character of the contract is made to appear." (*Morrill* v. *Nightingale*, 93 Cal. 452; *Handy* v. *St. Paul Globe Pub. Co.* 41 Minn. 188).

In *Gravier's Curator* v. *Carraby's Exr.* 17 La. (O. S.) 83, where the objection, that an agreement was contrary to public policy, had not been raised in the court below, and it was urged that the upper court could not consider it, the Supreme Court of Louisiana said: "Where an exception is put in at the argument in the Supreme Court, suggesting that the contracts between the parties to the suit are illegal, immoral and contrary to public policy, the court is bound to notice it, even without any plea; and in such cases no recovery can be had." (*Merchants' Savings, Loan and Trust Co.* v. *Goodrich*, 75 Ill. 554).

For the reasons above stated the judgment of the Appellate Court is affirmed.                    *Judgment affirmed.*