ILLINOIS OFFICIAL REPORTS

***Ritacca v. Girardi*, 2013 IL App (1st) 113511**

| | |
|---|---|
| Appellate Court Caption | DANIEL J. RITACCA, Plaintiff-Appellant, v. JOHN GIRARDI and JARED MARCUCCI, Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-3511 |
| Filed | September 13, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from the dissolution of the business the parties created to engage in the laser removal of hair, the trial court erred in dismissing plaintiff's complaint alleging that defendants breached the settlement agreement under which the business was terminated and the parties divided the remaining liabilities, notwithstanding the fact that the physician services agreement governing the business while it was operating was unenforceable under the Medical Practice Act and the Medical Corporation Act because one defendant was not a physician, since plaintiff's complaint was not based upon the illegal physician services agreement, it did not seek to enforce that contract, the illegal fee-splitting arrangement that existed while the business was operating had terminated, and under the circumstances, the public policy against enforcement of the settlement did not "clearly outweigh" the interest in enforcement. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-M2-2650; the Hon. Thaddeus Machnik, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal

David A. Novoselsky and Ryan A. Navarra, both of Novoselsky Law Offices, of Chicago, for appellant.

Edward E. Campbell, of Law Office of Edward E. Campbell, Ltd., of Chicago, for appellees.

Panel

JUSTICE TAYLOR delivered the judgment of the court, with opinion. Justices McBride and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1　In this breach of contract action, plaintiff Daniel Ritacca appeals from the trial court's grant of summary judgment for defendants John Girardi and Jared Marcucci on grounds that the contract between the parties was illegal and therefore unenforceable.

¶ 2　In 2000, plaintiff and the defendants established a medical services company known as the Laser Care Institute. Plaintiff and Girardi were licensed physicians, while Marcucci was a nonphysician. Their business arrangement was governed by a physician services agreement (PSA). In 2003, the parties entered into a settlement agreement that dissolved the Laser Care Institute and resolved all claims between them. In particular, it assigned liability between them for various outstanding loans associated with laser equipment that had been used by the business. When defendants defaulted on their loans, the lender brought suit against the plaintiff as well as the defendants. Plaintiff settled with the lender for the sum of $65,000. Plaintiff then brought the instant suit against defendants, seeking damages for breach of the settlement agreement.

¶ 3　The trial court found that the PSA violated the Illinois Medical Practice Act of 1987 (225 ILCS 60/1 *et seq.* (West 2010)), which prohibits fee-splitting between physicians and non-physicians. It held that this illegality rendered both the PSA and the resulting settlement agreement void and unenforceable, and it granted summary judgment for defendants. For the reasons that follow, we reverse the judgment of the trial court.

¶ 4　　　　　　　　　I. BACKGROUND

¶ 5　Plaintiff's third amended complaint, which frames the issues in this appeal, alleges the following. In July 2000, plaintiff, Marcucci, and Girardi "entered into a partnership" in order to perform Lasik surgical procedures and laser hair removal. On August 30, 2000, the parties signed the PSA, a copy of which is attached to the complaint. That agreement provides, in relevant part:

　　　"THIS AGREEMENT ('Agreement') is made and entered into this 30th day of

-2-

August 2000 by and between Daniel J. Ritacca, M.D., John T. Girardi, M.D., and Jared J. Marcucci with regard to the Laser Care Institute ('Corporation').

ORGANIZATION

The organization of the Laser Care Institute will be an equal partnership between Daniel J. Ritacca, M.D., John T. Girardi, M.D., and Jared J. Marcucci. Each partner will maintain ownership of 33 1/3% of the Corporation."

According to plaintiff's complaint, the Laser Care Institute purchased various pieces of medical equipment, and the purchases were financed through loans from CitiCorp Vendor Finance, Inc. (CitiCorp).

¶ 6       The complaint further states that in 2003, the parties dissolved the Laser Care Institute. At that time, the loans to CitiCorp had not yet been fully repaid. Accordingly, on July 23, 2003, the parties entered into a settlement agreement for purposes of distributing the medical equipment and the loans associated with the purchase of that equipment. In particular, the agreement provided that Girardi would take possession of a hair removal laser known as a Vasculight HR and be responsible for repaying or refinancing the associated loan, while Marcucci would take possession of a Vasculight SR and be responsible for repaying or refinancing the associated loan.

¶ 7       However, according to the complaint, Girardi and Marcucci failed to repay or refinance the loans as stated in the settlement agreement. On February 28, 2006, CitiCorp filed a lawsuit against plaintiff, Girardi, and Marcucci, seeking to recover unpaid balances for the Vasculight HR and Vasculight SR. Plaintiff settled CitiCorp's claim for nonpayment for the sum of $65,000. Plaintiff then filed the instant lawsuit against Girardi and Marcucci.

¶ 8       The complaint seeks relief in three counts. Count I, which alleged that defendants breached the PSA, was later voluntarily withdrawn by plaintiff and is not at issue on appeal.[1] Counts II and III seek damages for breach of the settlement agreement against Girardi and Marcucci, respectively.

¶ 9       On August 12, 2010, Marcucci moved for summary judgment. In that motion, Marcucci argued that the PSA was illegal and unenforceable because it violated section 22.2 of the Medical Practice Act, which prohibits physicians from splitting fees with nonphysicians. 225 ILCS 60/22.2(a) (West 2010) ("A licensee under this Act may not directly or indirectly divide, share or split any professional fee or other form of compensation for professional services with anyone in exchange for a referral or otherwise ***."). Marcucci further argued that this illegality extended to the settlement agreement, the expressly stated purpose of which was to wrap up the affairs of the illegal business arrangement between the parties.

¶ 10       In support of his contention that the business arrangement created by the PSA was illegal and unenforceable, Marcucci attached a copy of the articles of incorporation for the "Laser Care Institute, S.C.," filed with the Secretary of State on July 24, 2000. A rider attached to

---

[1]In that count, plaintiff alleges that defendants agreed to pay him $15,000 as a "training/consultation fee" and to reimburse him for his purchase of a Nidek keratome, which is apparently unrelated to the medical equipment that is at issue in counts II and III.

the articles of incorporation states: "All officers, directors, and shareholders of the Corporation shall at all times be licensed pursuant to the Medical Practice Act. No person who is not licensed shall have any part in the ownership, management, or control of the corporation."

¶ 11      On January 10, 2011, Girardi filed a motion for summary judgment which largely echoed the legal arguments raised by Marcucci, namely, that the fee-splitting arrangement in the PSA violated the Medical Practice Act and therefore rendered both the PSA and the settlement agreement void and unenforceable.

¶ 12      On May 4, 2011, the trial court granted defendants' motion for summary judgment. In its judgment order, the court explained its reasoning as follows:

> "Clearly, the Physician Services Agreement expressly contravenes the Medical Practices [*sic*] Act and violates public policy. Correlatively, the Settlement Agreement, which arose from the Physician Services Agreement, is void and unenforceable. *** Counts II and III of the complaint are both premised on a statutorily prohibited, fee splitting arrangement. The Settlement Agreement flows from an illegal partnership, seeking payment for equipment purchased within the context of this arrangement."

It is from this judgment that plaintiff now appeals.

¶ 13                           II. ANALYSIS

¶ 14      On appeal, plaintiff contends that the trial court erred in finding the settlement agreement to be illegal and unenforceable. In support, plaintiff raises two main arguments. First, he argues that the PSA does not violate the Medical Practice Act. Second, he argues that even if the PSA were in violation of the Medical Practice Act, its illegality would have no effect on the settlement agreement, which is a separate and independent contract with no illegal terms on its face. Marcucci challenges both of these contentions.[2]

¶ 15      In considering the arguments of the parties, we are mindful that summary judgment is only appropriate if, "when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *General Casualty Insurance Co. v. Lacey*, 199 Ill. 2d 281, 284 (2002) (citing 735 ILCS 5/2-1005(c) (West 2000)). It should only be granted where the movant's right to judgment is clear and free from doubt. *Reed v. Bascon*, 124 Ill. 2d 386, 393 (1988). Accordingly, the evidence should be construed strictly against the movant (*Reed*, 124 Ill. 2d at 393), and where fair-minded persons could draw different inferences from the facts, summary judgment should not be granted (*In re Estate of Roeseler*, 287 Ill. App. 3d 1003, 1013 (1997)). We review the trial court's entry of summary judgment *de novo*. *General Casualty Insurance*, 199 Ill. 2d at 284.

---

[2]Marcucci is the only defendant to have filed a brief in this appeal. Girardi did not file a brief or join in Marcucci's brief.

¶ 16           A. Legality of the PSA

¶ 17  We begin by considering the legality of the PSA. As noted, the trial court premised its grant of summary judgment upon its finding that the PSA violated the Medical Practice Act's prohibition against fee splitting between licensed physicians and nonlicensed physicians. Plaintiff challenges this finding. Although he admits that Marcucci was not a physician, he argues that the fee-splitting prohibition does not apply to the Laser Care Institute because it falls under an exception contained in section 22.2(c)(2) of the Medical Practice Act (225 ILCS 60/22.2(c)(2) (West 2010)) for entities organized under the Medical Corporation Act (805 ILCS 15/1 *et seq.* (West 2010)).

¶ 18  Initially, Marcucci argues that plaintiff has waived this argument by failing to raise it before the trial court. We agree. In his responses to defendants' motions for summary judgment, plaintiff explicitly declines to dispute the contention that the PSA is illegal and unenforceable. Instead, plaintiff states, "The enforceability of the Physician Services Agreement is not relevant." In his reply brief before this court, plaintiff broadly asserts that he has waived no arguments on appeal, but the record citations that he provides in support do not contain any arguments regarding the legality of the PSA. Accordingly, plaintiff has waived any such claim. See *Bank of Carbondale v. Kansas Bankers Surety Co.*, 324 Ill. App. 3d 537, 540 (2001) (an argument not raised in the trial court is waived for purposes of review); *In re Application of the County Collector*, 332 Ill. App. 3d 277, 284 (2002) (failure to identify where in the record an argument was made before the trial court results in waiver on appeal).

¶ 19  However, even if we were to overlook plaintiff's waiver and consider his argument on its merits (see *People v. Normand*, 215 Ill. 2d 539, 544 (2005) (waiver is an admonition to the parties, not a limit on the jurisdiction of the court)), we would still reject his contention that the PSA's fee-splitting arrangement is in compliance with relevant statutes. The statutory provision that plaintiff relies upon is in section 22.2(c)(2) of the Medical Practice Act, which provides:

  "(c) Nothing contained in this Section prohibits a licensee under this Act from practicing medicine through or within any form of legal entity authorized to conduct business in this State or from pooling, sharing, dividing, or apportioning the professional fees and other revenues in accordance with the agreements and policies of the entity provided:

    ***

  (2) the entity is organized under the Medical Corporation Act ***." 225 ILCS 60/22.2 (West 2010).

¶ 20  Plaintiff argues that the Laser Care Institute is a corporation organized under the Medical Corporation Act and therefore falls under this exception to the fee-splitting prohibition. In response, Marcucci argues that the Laser Care Institute as referenced in the PSA was a partnership, not a corporation, and therefore the exception in section 22.2(c)(2) of the Medical Practice Act cannot apply.

¶ 21  We find the record to be unclear as to the Laser Care Institute's corporate status. As Marcucci points out, in his third amended complaint, plaintiff repeatedly refers to the Laser

Care Institute as a "partnership" and makes no mention of it being a corporation. Plaintiff additionally refers to the Laser Care Institute as a partnership in an affidavit that he filed in this action on September 29, 2009. In that affidavit, which largely echoes the allegations in his complaint, he states: "On or about July, 2000, I entered into a partnership *** with John Girardi ('Girardi') and Jared Marcucci ('Marcucci')." He also states, "During the pendency of the partnership, the partnership purchased various pieces of equipment" and "On July 23, 2003, the partnership terminated."

¶ 22        However, the record contains a copy of the articles of incorporation for the "Laser Care Institute, S.C.," filed with the Secretary of State on July 24, 2000, which indicates that the Laser Care Institute was, in fact, a corporation. (In fact, Marcucci attached a copy of these articles to his motion for summary judgment.) Marcucci attempts to explain this by claiming that the Laser Care Institute created by these articles of incorporation and the Laser Care Institute referenced in the PSA are separate entities, and the latter is merely a partnership, consistent with plaintiff's language in both his complaint and in his affidavit. Plaintiff disputes this allegation. Plaintiff further argues that he is not a businessman or lawyer, and when he spoke of the Laser Care Institute as a "partnership," he was using the term colloquially, rather than making a technical statement as to the organization of the business.

¶ 23        The text of the PSA itself does not shed any light on this situation, since it refers to the Laser Care Institute as both a partnership and as a corporation: "The organization of the Laser Care Institute will be an equal partnership between Daniel J. Ritacca, M.D., John T. Girardi, M.D., and Jared J. Marcucci. Each partner will maintain ownership of 33 1/3% of the Corporation."

¶ 24        In any event, we need not decide the issue of the Laser Care Institute's corporate status, because even if we assume that plaintiff is correct and the Laser Care Institute was a corporation organized under the Medical Corporation Act, it would be in violation of section 13 of that Act. That section provides: "All of the officers, directors and shareholders of a corporation subject to this Act shall at all times be persons licensed pursuant to the Medical Practice Act of 1987. No person who is not so licensed shall have any part in the ownership, management, or control of such corporation ***." 805 ILCS 15/13 (West 2010). In this case, the PSA states that Marcucci, a nonphysician, maintained a one-third ownership interest in the Laser Care Institute. Therefore, even viewing the record in the light most favorable to plaintiff (see *General Casualty Insurance*, 199 Ill. 2d at 284 (summary judgment standard)), we find that the trial court was correct in finding the PSA to be illegal.

¶ 25                    B. Enforceability of the Settlement Agreement

¶ 26        Plaintiff next argues that even if the PSA was illegal and thus unenforceable, its illegality would not transfer to the subsequent settlement agreement, which is a separate and independent contract. Marcucci, on the other hand, contends that the settlement agreement flows from the illegal PSA and therefore effectively inherits its illegality. We agree with plaintiff.

¶ 27        The general rule is that for a new contract that follows a prior illegal contract to be enforceable, " 'the new contract must be in no sense a continuation or modification of the

old. The old contract must be utterly abandoned, so that neither its terms or its consideration, nor any claims of right springing out of it, shall enter the new.' " *Manning v. Metal Stamping Corp.*, 396 F. Supp. 1376, 1378 (N.D. Ill. 1975) (quoting *Webster v. Sturges*, 7 Ill. App. 560, 564 (1880)); see also *Teich v. City of Chicago*, 298 Ill. 498, 501 (1921) ("In a case where such a party can show a right of recovery without relying on the illegal contract and without having the court sanction the same he may recover in any appropriate action."). Conversely, when parties to an illegal contract attempt to extend or renew the contract by entering into a new agreement, even where that new agreement is not otherwise tainted by illegal activity, it is void and unenforceable. *Manning*, 396 F. Supp. at 1378 (citing *Nash v. Monheimer*, 20 Ill. 215 (1858)).

¶ 28        The facts of *Manning*, 396 F. Supp. 1376, are illustrative because of how dissimilar they are to the present case. In 1968, the *Manning* defendant hired plaintiff to serve as its exclusive representative covering government contracts for the manufacture of license plates in Illinois. *Id.* at 1377. Part of plaintiff's job was to illegally purchase influence with the office of the Secretary of State, Paul Powell. *Id.* In 1970, shortly after the death of Paul Powell, the parties signed a second contract extending their agreement for an additional two years. *Id.* at 1377-78. The enforceability of that second contract was the issue on appeal. *Id.* Plaintiff argued that with Paul Powell's death, his influence with the Secretary of State's office ended, so the second contract was entirely for legitimate services. *Id.* at 1378.

¶ 29        Applying Illinois law, the *Manning* court found that, on its face, the second contract was merely a continuation of the prior illegal contract. *Id.* at 1379. In fact, the second contract stated, " 'For our part, we are of the opinion that the arrangement has been satisfactory and we would like to take this opportunity to extend our agreement, as of this date, for an additional two years, at which time it will again be reviewed.' " *Id.* at 1378. In addition, the terms of the second contract could not even be determined without reference to the prior illegal contract. *Id.* Based upon this language, the *Manning* court held that the second contract was an "outgrowth and continuation" of an admittedly illegal prior contract and was unenforceable as a matter of law. *Id.* at 1379.

¶ 30        By contrast, in the present case, the settlement agreement did not continue or renew the illegal business arrangement established by the PSA but, rather, dissolved it. Indeed, the settlement agreement explicitly states:

> "That the parties to this agreement had been engaged in providing laser eye surgery and laser hair removal.
>
> That the parties have discontinued providing these services to their clients together, and *are no longer working together in any capacity*." (Emphasis added.)

Thus, it is apparent from the face of the contract that the settlement agreement was " 'in no sense a continuation or modification of the old [contract].' " *Id.* at 1378 (quoting *Webster*, 7 Ill. App. at 564). On the contrary, it represented the parties' agreement to abandon that prior contract and its illegal fee-splitting arrangement. See *Manning*, 396 F. Supp. at 1378 (new contract is enforceable if the prior illegal contract has been "utterly abandoned"). Marcucci admits as much in his brief when he says, "It is thus uncontested that the very purpose and essence of the [settlement agreement] was to dissolve the (illegal and void)

partnership." Moreover, the parties' rights and responsibilities can be determined solely from the settlement agreement, without any need to rely upon or even to refer to the terms of the PSA. See *Teich*, 298 Ill. at 501 ("In a case where such a party can show a right of recovery without relying on the illegal contract and without having the court sanction the same he may recover in any appropriate action."). Consequently, under the principles articulated in *Manning* and *Teich*, the settlement agreement is not rendered unenforceable by the illegality of the PSA. We note at this juncture that Marcucci makes no effort in his brief to discuss *Manning* and *Teich* or explain why the principles in these cases would not apply to permit recovery in the instant case.

¶ 31    Furthermore, although the parties have not cited, nor has our research disclosed, any Illinois case that is directly on point with the facts of the instant case, the Supreme Court of Washington reached a similar conclusion in *McDonald v. Lund*, 43 P. 348 (Wash. 1896), which concerned the division of profits from an illegal business after the dissolution of that business. The *McDonald* plaintiff and defendant were partners in an illegal gambling business. *Id.* at 348. Defendant was the banker for the operation and kept all of the profits in his possession, but the parties understood that plaintiff was entitled to half of them. *Id.* After the partnership had ended, defendant refused to pay plaintiff his share of the profits, and plaintiff brought an action against him for breach of contract. *Id.*

¶ 32    The *McDonald* court acknowledged the general rule that courts will not enforce illegal contracts. *Id.* Nevertheless, the court held that plaintiff was entitled to recover the agreed-upon share of the profits. The court explained its reasoning as follows:

"[T]his is not a case to enforce any illegal contract, but it is to assert title to money which was accumulated under such illegal contract. *** Under the stipulated facts the illegal transaction which these parties had agreed to pursue had ended. The partnership for that purpose was no longer in existence. The business was no longer being carried on." *Id.* at 349.

See also *id.* at 350 (" 'The court is there not asked to enforce an illegal contract. The plaintiffs do not require the aid of any illegal transaction to establish their case. It is enough that the defendants have in hand a thing of value that belongs to them.' " (quoting *Planters' Bank of Tennessee v. Union Bank*, 83 U.S. (16 Wall.) 483, 499-500 (1872))). Thus, because plaintiff's suit "was not founded upon the alleged illegal contract, nor brought to enforce any of the conditions or stipulations of that contract," the *McDonald* court ruled that he was entitled to recover. *Id.* at 351.

¶ 33    Likewise, the present suit was not founded upon the illegal PSA, nor was it brought to enforce any of the conditions and stipulations of that contract. At the time that plaintiff brought the instant suit, the illegal fee-splitting arrangement was no longer in existence, having been explicitly terminated pursuant to the terms of the settlement agreement. In fact, the present case presents a stronger argument for recovery than *McDonald*, because the plaintiff in this case, unlike the *McDonald* plaintiff, is not seeking to recover the fruits of his illegal conduct.

¶ 34    Marcucci nevertheless argues that the settlement agreement's connection to the PSA is sufficient to render it illegal and void. In this regard, he cites *Henderson v. Palmer*, 71 Ill.

579 (1874) (contract to forbear from prosecution was against public policy and unenforceable), and *Crichfield v. Bermudez Asphalt Paving Co.*, 174 Ill. 466, 481 (1898) (contract to solicit and promote the asphalt-paving business was unenforceable where certain provisions had a tendency to promote bribery and corruption of public officials), for the proposition that if any part of a contract is illegal, the entire contract is illegal and unenforceable. However, this principle would not apply to the present case, since the settlement agreement is a separate and independent contract from the PSA and contains no illegal provisions on its face. Moreover, in any event, our supreme court has more recently rejected this principle. Rather, in *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284, 294 (2010), the court explicitly adopted section 178 of the Restatement (Second) of Contracts, which, as shall be discussed in greater detail below, provides that a statutory violation does not automatically render a contract unenforceable. See Restatement (Second) of Contracts § 178 (1981). Instead, courts must conduct a balancing test, weighing the public policy expressed in the statute against the policy in enforcing contractual agreements. *K. Miller*, 238 Ill. 2d at 293; Restatement (Second) of Contracts § 178 (1981).

¶ 35    In *K. Miller*, defendants formed an oral contract with plaintiff, a construction firm, to perform a home remodeling project. *K. Miller*, 238 Ill. 2d at 287. After completion of the project, defendants refused to pay plaintiff the balance of over $300,000. *Id.* at 288. Plaintiff brought suit for breach of contract. *Id.* Defendants filed a motion to dismiss, contending that the oral contract was in violation of statute and therefore unenforceable as a matter of public policy. *Id.* at 289. In support, they cited section 30 of the Home Repair and Remodeling Act, which at the time provided that it was " 'unlawful' " to engage in home remodeling for work totaling more than $1,000 before obtaining a signed contract. *K. Miller*, 238 Ill. 2d at 289 (quoting 815 ILCS 513/30 (West 2006)). The trial court granted defendants' motion to dismiss. *Id.* at 290.

¶ 36    Our supreme court reversed. In doing so, the court rejected the bright-line rule urged by the *K. Miller* defendants, as well as the defendants in the instant action. *Id.* at 295. The court explained that "the fact that there has been a statutory violation does not, in itself, automatically render a contract unenforceable." *Id.* at 295. Instead, enforceability of such a contract is determined according to the balancing test set forth in section 178 of the Restatement (Second) of Contracts, which provides:

    " '(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

       (2) In weighing the interest in the enforcement of a term, account is taken of

          (a) the parties' justified expectations,

          (b) any forfeiture that would result if enforcement were denied, and

          (c) any special public interest in the enforcement of the particular term.

       (3) In weighing a public policy against enforcement of a term, account is taken of

          (a) the strength of that policy as manifested by legislation or judicial decisions,

-9-

(b) the likelihood that a refusal to enforce the term will further that policy,

(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

(d) the directness of the connection between that misconduct and the term.' " *Id.* at 293 (quoting Restatement (Second) of Contracts § 178 (1981)).

Under this section, if a statute does not explicitly state whether a violation of the statute will render a contractual term unenforceable, then the court must balance the policy contained in the statute against the policy favoring enforcement of contractual agreements. This balancing process is further explained in comment b:

"In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is so trivial as that it plainly does not preclude enforcement. In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms. The most common factors in the balancing process are set out in Subsections (2) and (3). Enforcement will be denied only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term." Restatement (Second) of Contracts § 178 cmt. b (1981).

¶ 37    As noted by the *K. Miller* court, there are multiple other Illinois cases, all more recent than *Henderson* and *Crichfield*, that are in accord with the Restatement on this matter. *K. Miller*, 238 Ill. 2d at 295-96. For instance, in *Pascal P. Paddock, Inc. v. Glennon*, 32 Ill. 2d 51 (1965), the defendant property owners hired a contractor to construct a swimming pool and bathhouse on their property. When the owners refused to pay, the contractor brought suit to enforce a mechanic's lien. *Id.* at 52. Defendants argued that the contract was illegal and unenforceable because plaintiff had failed to prove compliance with the Illinois Plumbing License Law (Ill. Rev. Stat. 1961, ch. 111½, ¶ 116.38), which provided that plumbing could only be performed by plumbers who were duly licensed under that act. *Pascal*, 32 Ill. 2d at 52. The *Pascal* court rejected this argument and found the underlying contract to be enforceable, stating that "it can hardly be said that any violation of the licensing statute which may have occurred was seriously injurious to the public order." *Id.* at 54. Thus, the mere fact that the contract might have been performed in violation of statute did not automatically render the contract unenforceable. *Id.* at 53-54. See also *Federal Land Bank of St. Louis v. Walker*, 212 Ill. App. 3d 420, 422 (1991) ("Merely because a contract may violate some law or some regulation does not necessarily make that contract unenforceable."); *Duncan v. Cannon*, 204 Ill. App. 3d 160, 169-70 (1990) (plaintiff's failure to comply with municipal ordinance did not preclude recovery for breach of contract); *South Center Plumbing & Heating Supply Co. v. Charles*, 90 Ill. App. 2d 15, 18 (1967) ("not all violations of law brought about in the performance of a contract are considered serious enough to prevent recovery on the contract by the party who violates the law").

¶ 38    In the present case, we do not need to undertake the balancing test set forth in *K. Miller*

-10-

and in section 178 of the Restatement, because, as has been discussed, the settlement agreement contains no illegal terms on its face and is in no sense a continuation or modification of the illegal PSA. See *Manning*, 396 F. Supp. at 1378. However, if we were to apply the balancing test to the facts of this case, strong argument could be made that it would weigh in favor of enforcement.

¶ 39    We begin by considering the public policy against the enforcement of the settlement agreement. The fee-splitting prohibition in the Medical Practice Act is motivated by concerns that fee-splitting arrangements may compromise the judgment of physicians, influencing them to provide unnecessary but profitable treatment, and may also cause nonphysicians to recommend physicians out of self-interest. *Center for Athletic Medicine, Ltd. v. Independent Medical Billers of Illinois, Inc.*, 383 Ill. App. 3d 104, 112-13 (2008). Because of the significance of these policy concerns, courts have typically found fee-splitting arrangements to be void and unenforceable. See *id.* at 113. Marcucci argues this principle is controlling in the case at hand. However, the plaintiff in this case is not seeking to enforce an illegal fee-splitting arrangement, or even any provision in a contract that contains such an arrangement. Nor was the settlement agreement drafted to support or supplement an ongoing fee-splitting enterprise. On the contrary, the settlement agreement plainly states that the parties had ceased doing business together in any capacity. Plaintiff and Girardi, the two physicians, were no longer splitting fees with Marcucci, as might compromise their professional judgment; similarly, Marcucci would no longer have an incentive to recommend plaintiff and Girardi out of self-interest. Under such circumstances, refusal to enforce the settlement agreement would arguably do little to further the policy behind the Medical Practice Act. Similarly, the connection between the parties' misconduct and the contractual term at issue is tenuous at best where the parties had already abandoned all such misconduct before entering into the contract at issue. See Restatement (Second) of Contracts § 178 (1981) (in weighing the public policy against enforcement of a term, courts must consider "the likelihood that a refusal to enforce the term will further that policy," as well as "the directness of the connection between that misconduct and the term").

¶ 40    In light of this analysis, strong argument could be made that the public policy against enforcement of the settlement agreement does not "clearly outweigh" the interest in enforcement, particularly given the law's "abhorrence of any unjust enrichment." Restatement (Second) of Contracts § 78 cmt. b (1981). It is undisputed for purposes of this appeal that plaintiff paid off loans for which the defendants were responsible under the plain language of the settlement agreement. This enrichment of the defendants, and the concomitant forfeiture by the plaintiff if the settlement agreement is not enforced by the courts, is a significant factor in favor of enforcement. See Restatement (Second) of Contracts § 178 cmt. d (1981) (The interest in favor of enforcement becomes much stronger after the promisee has relied substantially on those expectations as by preparation or performance.). Accordingly, even if we were to apply the balancing test articulated in *K. Miller* and the Restatement to this case, the facts of this case would seem to weigh in favor of enforcement.

¶ 41                          III. CONCLUSION

¶ 42        Therefore, for the foregoing reasons, we reverse the trial court's grant of summary judgment in favor of defendants and remand for further proceedings.

¶ 43        Reversed and remanded.